[Civ. No. 17210.   First Dist., Div. One.   Oct. 29, 1957.]

JOSEPH D. ORLANDO, Respondent, v. HERMAN BERNS
et al., Appellants.

Charles R. Wayland and Gallagher, Ruffo & Rainville for Appellants.

Avery J. Howe, Howe, Finch, Glass & Clark and Howe, Finch & Glass for Respondent.

WOOD (Fred B.), J.—Of the issues discussed by the parties upon this appeal two are crucial: (1) Was this a loan transaction? (2) If so, was it a usurious loan?

The principal undisputed facts are as follows: During the period 1947-1950 plaintiff had been improving certain of his real property. By July, 1950, he had become indebted in the sum of $178,150.48 and was in imminent danger of losing the property and improvements by foreclosure or forced sale. He encountered difficulty in getting a loan to liquidate his debts and sought the assistance of defendant Herman Berns. Their negotiations resulted in plaintiff deeding all of the property to defendants, who gave him a written option to repurchase, conditioned upon his paying within one year $4,120 owing to Hampton and Estelle Jones (secured by second deed of trust upon the property), plaintiff to exercise the option by giving notice in writing within one year after the expiration of six and a half months from date and executing with the defendants a contract of purchase upon the terms and conditions specified in the option agreement.

Defendants agreed to and did obtain a loan of $145,000 upon a substantial portion of this property, evidenced by

their promissory note to the lender and secured by their deed of trust upon said portion of the property. They used the $145,000 proceeds of the loan and the additional sum of $30,874.20 in the payment of plaintiff's debts. In the escrow which was used to effect this transaction, plaintiff was charged with the cost of recording the deed to the defendants, and the deed of trust to the lender, title and escrow fees of $664 and other incidental costs.

In due season (July 17, 1951), plaintiff paid the $4,120, exercised the option, and executed the contract of repurchase at the agreed price of $200,000 (payable within 4½ years from date, July 17, 1951) less the amount of the balance of the $145,000 remaining due at the time of conveyance. Meanwhile, defendants would pay the $917.85 monthly installments of principal and interest (4.5 per cent) falling due on the $145,000 loan and plaintiff would pay to defendants (to apply upon the repurchase price) all net income derived from the property. Meanwhile, also, plaintiff would keep the buildings in good condition and pay all taxes, assessments and liens, but defendants would have full control and management of the property and the sole right to collect rentals and other income (applying to the repurchase price all proceeds after payment of necessary expenses in maintaining the property) and would have the power to negotiate leases and extensions of leases, but not to execute leases or extensions nor to make capital improvements without plaintiff's consent. Upon completion of payment of the repurchase price, defendants would convey to plaintiff and he would assume and agree to pay the obligation to the lender of the $145,000. Accordingly, defendants' names remained on the $145,000 note.

On July 1, 1954, plaintiff brought this action for declaratory relief, claiming this to have been a loan transaction, defendants claiming it was simply a case of a sale and an option to repurchase.

(1) *The trial court found that the "whole transaction* described in the complaint and herein set forth *consisting of the deed, option, contract and advancements by defendants, was in fact a loan and not a sale* and that said deed . . . was given as security . . . and did not convey the full legal title to the defendants or either of them."

The evidence supports this finding. Plaintiff testified that for six months prior to July, 1950, he did not have a very good credit rating and had a difficult time getting a loan.

He was unable to pay his debts without help. He sought insurance company loans but did not think they could lend enough and so he contacted defendant Herman Berns who had loaned him money on several occasions in the past. They talked about advancements on this property and ·that is what brought about this contract; Berns would obtain $145,-000 from the insurance company and pay all of the indebtedness over that amount and for his service he wanted interest and a bonus ($12,000 interest and a bonus of $8,000, were mentioned); Berns would receive a first mortgage on the property that was clear and a second on the property covered by the insurance company loan. It was a package deal. It took the form it did because that was the only way that Berns would advance plaintiff the money. Berns said he would give plaintiff an option to repurchase. It was all right with plaintiff at the time because he did not have any other recourse. Mr. Berns demanded a deed and plaintiff demanded an option immediately to buy the property back. Because of his precarious financial condition plaintiff did not obtain a sufficient loan and at that time and had to get somebody who had credit and could go to one of these lending agencies and obtain the amount of money plaintiff needed. Asked why, if he considered this a loan, he raised no question about it when he received defendant's annual statements of receipts and expenditures, plaintiff said he did not want to have much to do with defendant because he always thought himself in a precarious position and so thought he would wait this out and finally either sell the property or get another loan to pay the defendant off.

The court found the value of all the property conveyed to defendants was $292,000, which is supported by plaintiff's testimony as to the values of the various parcels of land and the several improvements thereon. Some of these values were as of the trial date (March, 1955) but plaintiff said they were substantially the same in 1950. Defendants did not challenge these figures with evidence of their own. Indeed, it appears that they valued the buildings about $23,000 higher than the values which plaintiff placed upon them.

■ The question naturally occurs: Why, if this was simply a sale and a resale (not a loan) was there such a wide spread between the value and the price upon each occasion? The sale price (retirement of debts totaling $178,000) was $114,000 less than the value of the property sold. The resale price ($200,000 plus $4,000) was $88,000 less than that value.

Plaintiff did not know how the sum of $200,000 was arrived at but did remember that defendants paid for his indebtedness that exceeded $145,000 and wanted $12,000 interest and $8,000 bonus above the amount of money that they paid out.

Defendant Berns testified that he arrived at the $200,000 figure in the following manner: The $145,000 proceeds of the loan and the $23,325.48 paid into the escrow plus items paid outside the escrow (two of plaintiff's notes, attorney fees and insurance, for example) plus additional foreseeable future items of cost, made a total of $186,274.54. Interest at 6 per cent on that sum over a period of 5½ years would come to $61,470.50. Meanwhile, defendants would be paying the monthly installments of principal and interest at 4½ per cent on the $145,000 loan. "Therefore, if I had just loaned the man $186,274.54 at six percent, he would owe me $29,590.60; and the original outlay of money which I have shown here is $31,792.33 and would come to $61,382.83." By that method, rather than by ascertaining the value of the land and buildings and using that value as a yardstick, did defendant arrive at $200,000 as the repurchase price. That is the thinking of a lender: What resale price would assure him a fair return for the use of his money and his credit? It tends to support plaintiff's testimony that this was really a loan, despite defendant's continued insistence that it was simply a sale and resale transaction.

■ Casting a loan transaction in the form of a sale with an option to repurchase does not insulate the transaction from the usury laws. (*Rosemead Co. v. Shipley Co.,* 207 Cal. 415, 418 [278 P. 1038]; *Milana v. Credit Discount Co.,* 27 Cal.2d 335, 340-341 [163 P.2d 869, 165 A.L.R. 621]; *Wood v. Angeles Mesa Land Co.,* 120 Cal.App. 313, 317 [7 P.2d 748]; 154 A.L.R. 1063.)

(2) *Was this a usurious loan?* The trial court found that it was, based upon a loan of $30,874.20 which the court found was the amount of cash advanced by the defendants in addition to the $145,000 insurance company loan obtained by them. Deducting the sum of $30,874.20 from $60,509.20 (the amount of the repurchase price less the unpaid residue of the $145,000 loan at the time of the exercise of the repurchase option), the court found that defendants exacted a charge of $29,635 from the plaintiff. The latter sum, treated as interest upon $30,874.20 obviously exceeds 7 per cent, which

the trial court deemed the maximum rate allowable, predicated upon a finding that there was no written agreement for a higher rate.

From such premises, the indicated conclusion inevitably followed. However, we are not convinced of the correctness of those premises in their entirety.

■ It appears that not less than the sum of $178,150 should be treated as the principal sum in computing the allowable rate of interest. This was the amount of the $145,-000 insurance company loan plus the $30,874[1] which the court found the defendants advanced in cash.

The $145,000 was an integral part of the transaction. The defendants hired it from the insurance company upon their own promissory note as makers. The fact that some of plaintiff's property was used as security does not detract from the fact that defendants obtained the money (which plaintiff was unable to do) and made it available to liquidate his debts and refinance his undertaking. Defendants continued as obligors to the insurance company and will continue so until plaintiff completes his repurchase and assumes the payment of the unpaid balance of $145,000. Indeed, they will continue obligated until the entire amount is paid unless and until the insurance company lender accepts the plaintiff as sole debtor in lieu of the defendants. Nor is a deficiency judgment beyond the realm of possibility if plaintiff defaults. This is not a purchase-price deed of trust to which the provisions of section 580b of the Code of Civil Procedure might apply.

The trial court's finding that the deed from plaintiff to defendants "was given as security for the loan of $30,874.20 from defendants to plaintiff" and that "defendants have never advanced any further or other sums than $30,874.20"[2] must be read in connection with the findings that the "defendants agreed to obtain a loan for . . . $145,000 . . . covering" a portion of plaintiff's land, that said loan was made by a certain insurance company "to defendants covering a period of twenty years" at a certain rate of interest [4½%] amortized, that "the proceeds from the loan . . .

---

[1] Defendants claim that they in fact advanced a greater sum ($41,274.54) which, they say, augments the principal to $186,274.54. Defendants failed to show that the difference represented moneys advanced by them and for which they had not been reimbursed. The evidence supports the finding in question.

[2] This particular finding, apparently, was in response to defendants' claim that they advanced $41,274.54 in cash.

$145,000, were placed in" the escrow "to be used and they were used to assist in paying the amount due and owing from the plaintiff amounting to $178,150.48," and that "thereafter defendants delivered into escrow . . . $23,325.48 . . . of their own money," and "in addition, defendants advanced, outside of escrow, to plaintiff, or cancelled plaintiff's promissory notes, additional credits and/or sums making in all as total advancements in cash or credits from defendants to plaintiff of . . . $30,874.20." There can be no doubt that defendants obtained and made available for and used the sum of $178,150.48 in the payment of plaintiff's debts, and that the trial court so found.[3]

The use which we have made of the $145,000, in making these computations, finds precedent in *Ewalt* v. *Mortgage Securities, Inc.,* 129 Cal.App. 559 [19 P.2d 60], where two notes were involved, each given for a portion of the total amount of the loan. One note called for a higher, the other for a lower rate than permitted by law. However, if the total amount of interest thus called for were applied to the combined total of the principal sum of the two notes, the rate would not be usurious. It was deemed proper to do so, the notes having been given as a part of a single transaction.

The parties have computed the amount of interest which would be payable, over the period indicated, upon the sum of $178,150.48, both at 7 per cent and at 10 per cent per annum. Deducting from that amount, in either case, the $4\frac{1}{2}$ per cent to the insurance company in respect to the $145,000 portion of the loan, the parties are in agreement that the amount charged by defendants would slightly exceed 7 per cent but would be well within the rate of 10 per cent. Plaintiff "concedes that if ten per cent is used for computation of interest, and the Court concludes this rate should be used on the $145,000.00 loan . . . , the total sum of interest so computed would be in excess of $29,635.09. . . ."

It is "competent for the parties to any loan or forbearance of any money, goods or things in action to contract in writing for a rate of interest not exceeding 10 percent per annum."

---

[3]We note in passing that a lender is not confined to the making of a charge which is limited to "interest" upon the loan or forbearance of "money." He may also charge "interest" upon the loan or forbearance of "goods or things in action."

Moreover, a lender's charges need not be confined strictly to "interest" charges. They may include a "fee, bonus, commission, discount or other compensation." (Const., art. XX, § 22.)

(Const., art. XX, § 22.) Have the parties so contracted "in writing"? We think so. The amount charged by the defendants for refinancing plaintiff's undertaking, including the use of their credit, their money and their managerial ability, appears from the writing, derivable from the amount of the loan, the amount of the repayment price, the time-span and other relevant factors. It is mathematically determinable by a comparison of the "sale" and the "repurchase" prices which the parties expressly agreed to in writing. It would be an anomaly in the law if, when the disguise which surrounds a given loan is pierced, the lender were to be penalized in the amount of the charges involved simply because the writing which the parties signed did not specifically label those charges as "interest" and did not explicitly designate a "rate" of interest. ■ Plaintiff suggests that if this court finds the transaction was a loan it will be necessary also to find the defendants guilty of fraud for claiming the transaction was a sale, and that equity should deny them interest because of the asserted fraud. The fallacy of such reasoning is obvious. That would be to penalize a man for an erroneous legal interpretation of a transaction. ■ More to the point is it to say that when, in a case such as this, a transaction is judically declared a loan, each party shall enjoy the benefits as well as bear the burdens of his contract, in accordance with its terms as judicially interpreted.

■ (3) *Defendants erroneously claim the complaint is fatally defective for its failure to join as defendants* the insurance company that made the $145,000 loan and the title company that handled the escrow.

The determination of the respective rights and obligations of the plaintiff and defendants as between them only does not affect the rights and obligations of the insurance company or of the title company. Additionally, the judgment expressly recognizes the priority status of the deed of trust which was given to secure the insurance company loan.

The remaining points (a claim that plaintiff failed to plead or prove a case for declaratory relief; asserted failure to find certain facts; a claim of abuse of discretion in the denial of a new trial) likewise are not well taken and need not be discussed at length.

In view of the conclusions we have reached, a new trial will not be necessary.

The judgment is reversed and the cause remanded with directions to the trial court to make such changes in the find-

ings of fact and conclusions of law as may be appropriate and to render judgment, not inconsistent with the views herein expressed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied November 27, 1957, and respondent's petition for a hearing by the Supreme Court was denied December 23, 1957.