[Civ. No. 5753.   Fourth Dist.   Jan. 8, 1959.]

W. W. COWLES, as Trustee in Bankruptcy, etc., Respondent, v. JOSEPH K. ZLAKET, Appellant.

Rutan, Lindsay, Dahl, Smedegaard, Howell & Tucker and Milford W. Dahl for Appellant.

Carl C. Cowles for Respondent.

GRIFFIN, P. J.—Plaintiff and respondent W. W. Cowles, as trustee in bankruptcy of the estate of A. G. Eldred and Company, a copartnership consisting of Arthur Gordon Eldred and Genevieve 1. Eldred, bankrupt, and Arthur G. Eldred, an individual, a bankrupt, brought this action against Joseph K. Zlaket, doing business as Cal-Properties, to recover $17,889.51 claimed due under alleged usurious transactions.

The complaint is long but the allegations are more or less simple. It sets out 16 separate causes of action. Each is essentially based on very similar facts and circumstances. All of the transactions involved took place in 1953 and 1954 between Arthur G. Eldred (hereinafter referred to as Eldred) on the one hand, and Joseph K. Zlaket (hereinafter referred to as Zlaket) on the other hand. After the transactions complained about transpired, Eldred filed a voluntary petition in bankruptcy and was adjudicated as such. Thereafter Cowles was appointed trustee in bankruptcy of the Eldred estates and brought this action in his capacity as trustee.

Eldred owned or had control of 16 separate promissory notes secured by deeds of trust on real property situated in Orange County. (Exhibit 4.) For the purpose of separately identifying them, at the trial they were referred to in the record

and will hereinafter be referred to as the Sandcamp, Bartee, Solis, Abernathy (1), Abernathy (2), Johnson, Gardea, Flores, Gaspar-Porath, Pluneda, Mendoza, Moss-White, Plasencia, Pokyn, Robinson and Cernich notes and deeds of trust. All were first liens on real estate in Orange County with the exception of the Bartee note and trust deed which was second to a very small balance remaining unpaid on a first deed of trust and for this reason it also was, for all practical purposes, a first deed of trust. The real estate covered by each of said deeds was of ample value to fully secure the notes.

On or about June 22, 1953, Eldred assigned and transferred to Zlaket the Sandcamp note and deed of trust. The principal was $7,500, and nothing had been paid on it. At the same time Zlaket delivered and transferred to Eldred $6,000 in cash and gave Eldred a so-called 90-day written agreement to reassign. About September 28, 1953, Eldred delivered and turned over to Zlaket cash in the sum of $6,240, and at the same time Zlaket reassigned and delivered back to Eldred the Sandcamp note and deed of trust. This transaction was not directly involved in the 16 causes of action set forth in the complaint but was put into evidence as being the first of a series of transactions between the parties and bearing on their subsequent actions and transactions.

About December 14, 1953, Eldred again assigned and delivered back to Zlaket this same Sandcamp note and deed of trust, and at the same time Zlaket delivered to Eldred $5,200 and gave to Eldred the written instrument entitled "Ninety Day Agreement," being the second of the group of written agreements (Exhibits 1 and 2). They were typed upon mimeographed forms prepared by Zlaket, and read in part as follows:

"THIS AGREEMENT, entered into this_____day of_____ by and between A. G. ELDRED (or A. G. ELDRED for the assignor) hereinafter referred to as the ASSIGNOR/S and CAL-PROPERTIES, JOSEPH K. ZLAKET, hereinafter referred to as the ASSIGNEE, WITNESSETH:

"THAT WHEREAS; On this_____day of_____195__ the aforementioned Assignor/s did sell, transfer and assign to the aforementioned Assignee, all right, title and interest to and within the following instruments of record, to wit:"

(Then follows a detailed description of the note and trust deed and the balance due, as indicated on said note.)

"AND WHEREAS: That for and in consideration of the afore-

mentioned right, title and interest to and within the_____ secured by_____above described, and as the full purchase price therefor, the said Assignee did pay to the said Assignor/s the sum of _____(net), lawful money of the United States, the receipt of which is hereby acknowledged by the said Assignor/s.

"Now THEREFORE: it is mutually agreed and understood by both the Assignor/s and the Assignee, that at any time prior to the expiration of Ninety (90) Days from date of this agreement, the said Assignor/s shall have the right and privilege to repurchase and have reassigned back to them the right, title and interest to and within the instruments hereinbefore described upon their performance and fulfillment of the acts and conditions as hereinafter stipulated, to wit:

"1.—That within the time limit of Ninety (90) days from date of this agreement, the said Assignor/s, for the purpose of repurchase, shall repay to the said Assignee the full sum above stipulated as the purchase price, which sum is $_____, plus a sum of $_____ (about 10 per cent of the purchase price), which sum constitutes a charge for services rendered or paid for, plus a sum equal to SIX (6%) PERCENT per annum on the stipulated remaining PRINCIPAL BALANCE as of date of this assignment from date of this agreement to the date that repayment be made to the Assignee.

"2.—That upon the payment by the Assignor/s to the Assignee of the total sums or a sum equal to all sums designated in paragraph numbered One (1) of this agreement in lawful money of the United States, the said Assignee agrees to resell and to reassign back to the said Assignor/s the right, title and interest to and within the instruments hereinbefore mentioned.

"IT IS FURTHER MUTUALLY UNDERSTOOD AND AGREED, that in the event the said Assignor/s shall fail to repay to the said Assignee the sum of money herein agreed upon and above stipulated, then at the expiration of the Ninety (90) Day period, the right and privilege of the said Assignor/s to repurchase or repay shall cease and no further obligation or duty shall rest upon the Assignee to the Assignor/s and this agreement shall be construed as null and void . . . .

(Signed) "A. G. Eldred
_____
(Assignor)

"Joseph K. Zlaket
"CAL-PROPERTIES (Assignee)"

About April 26, 1954, Eldred delivered to Zlaket cash in the sum of $5,740.26, and Zlaket again transferred and reassigned the said Sandcamp note and deed of trust back to Eldred.

About December 16, 1953, Eldred transferred and assigned to Zlaket seven of the trust deeds mentioned in Exhibit 4. At the same time Zlaket delivered to Eldred cash in the sum of $13,700, and Zlaket executed and delivered to Eldred seven separate written "Ninety Day Agreements," as above described, covering each of the respective aforesaid notes and deeds of trust. About December 21, 1953, Eldred transferred and assigned to Zlaket the remaining deeds of trust included in the group mentioned in Exhibit 4. At the same time Zlaket delivered to Eldred cash in the sum of $12,050, and Zlaket delivered to Eldred eight separate written "Ninety Day Agreements" similarly prepared. Thereafter, and prior to April 1, 1954, Eldred delivered to Zlaket the so-called "option price" mentioned in said "Ninety Day Agreements" covering five of that group and Zlaket reassigned and delivered back to Eldred said five notes and deeds of trust. All 16 notes and deeds of trust set forth in the complaint were similarly and eventually reassigned and redelivered by Zlaket to Eldred, and Eldred paid the amount demanded by Zlaket.

Throughout the testimony given by Zlaket he referred to said transaction as a sale from Eldred to him and a repurchase by Eldred from him under the terms of an option agreement. On the other hand, Eldred, throughout his testimony, referred to said transactions as loans and the repayment of loans. The whole case revolved about and depended upon the interpretation to be placed on these transactions in the light of the entire record. Plaintiff's theory of the case was that while the papers evidencing these transactions were in form a sale with an option back, yet they were in truth and in fact simply loans from Zlaket to Eldred, and that casting the transactions in the form of a sale with option to repurchase does not insulate them from the usury laws, citing *Orlando* v. *Berns,* 154 Cal.App.2d 753 [316 P.2d 705]; *Rosemead Co.* v. *Shipley Co.,* 207 Cal. 414 [278 P. 1038]; *Milana* v. *Credit Discount Co.,* 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621]; and *Wood* v. *Angeles Mesa Land Co.,* 120 Cal.App. 313, 317 [7 P.2d 748].

The trial court found that these transactions were in fact loans masquerading under the cloak of sales and resales under an option to repurchase; that usury was exacted and

paid, and the plaintiff was entitled to recover in accordance with the judgment entered.

Zlaket has appealed from the trial court's decision on two grounds: first, that the evidence does not support the trial court's findings; that the transactions could not be loans as there was no promise to repay; and second, that in any event plaintiff was not entitled to recover as to certain of said transactions for the reason that the evidence and the record shows that Eldred was not the owner of the securities which were pledged for certain of the loans.

It is further argued that there is a presumption of law that the transactions were legal and not usurious, citing *Rose* v. *Wheeler,* 140 Cal.App. 217, 220 [35 P.2d 220]; *Lindsey* v. *Campbell,* 132 Cal.App.2d 746 [282 P.2d 948]; and 91 C.J.S. p. 579; and that the documents themselves create and support the presumption of validity.

As will be noted, there is a direct conflict between the testimony of Eldred and Zlaket as to their interpretation of the nature of the transactions. In Eldred's deposition, taken while he was serving a prison term for conviction on three counts of theft involving two forgeries in connection with certain assignments herein involved, he testified generally that he was engaged in the real estate and mortgage loan business in Orange County; that Zlaket was also there engaged in a similar business; that he entered Zlaket's office and while sitting at his "loan desk" he said to him: "I see you are making a lot of loans," and that Zlaket replied "Yes"; that Zlaket then said he had a "new wrinkle" in loaning, i. e., he could charge above the legal rate of interest on loans; that he told him about these "Ninety Day Agreements" herein set forth whereby he purportedly purchased the notes and trust deeds with an option to repurchase, and accordingly on the repurchase he would receive 10 per cent of the amount advanced plus 2 per cent service charge plus 6 per cent interest on the unpaid balance on the trust deed; that he asked Zlaket if this form of an agreement was not more or less of a sham or an invasion of the law, and Zlaket said "No, his lawyer had prepared the document" and as far as he was concerned it was perfectly legal. Zlaket denied any such conversation. Throughout Eldred's testimony he referred to the transactions as loans and said his first approach to Zlaket was that he wanted to borrow money on these notes and trust deeds and would repay him in a week or within two or three months at the most; that he told him the lump sum he wished

to borrow and furnished Zlaket with a list of the trust deeds he had to place as security for the loan; that Zlaket examined the property and after some discussion, agreed to loan him the total sum sought; that it was agreed that Eldred would continue accepting the amounts of interest and principal on the notes in his office and then later turn them over to Zlaket, which he did; that he gave no notice to the trustors of the sale of the trust deeds or notes to Zlaket; and that he held assignments from the trustors to him. Cancelled checks of Eldred were received in evidence corroborating the fact of purchase by Zlaket and repurchase by Eldred in the amounts and at the times indicated.

Zlaket testified generally that he was in the real estate and opportunity brokerage business and had made some loans; that in the original transaction in reference to the Sandcamp trust deed, he bought it at the price of $6,000 and it was assigned to him by Eldred; that he drew up an original "Ninety Day Agreement," as described; that he and Eldred agreed therein that he should have the right to repurchase it within 90 days after payment of his usual profit of 10 per cent plus 2 per cent plus interest accrued, and that he resold said trust deed to Eldred for $6,073.15; that he bought it again at $5,200, and Eldred reassigned it to him with a second "Ninety Day Agreement" to repurchase, and that the other trust deeds and notes were similarly handled. He claims, however, no discussion was had about these transactions being for the purpose of securing a loan but they were absolutely an out and out sale with the right to repurchase. He testified Eldred asked him not to notify the trustor and not to collect the interest and payments for him; that he did tell the trustor in the Sandcamp transaction he had acquired the trust deed and note by assignment from Eldred and that Eldred was "peeved" because he did so; that on many occasions he visited Eldred's office for the purpose of obtaining the interest and payments but found nothing but evasive answers. He said, in buying the several trust deeds and notes, he specifically told Eldred if he repurchased them he would have to pay Zlaket the usual 10 per cent of the purchase price as profit, plus 2 per cent service charge, plus 6 per cent interest carried by the notes on the unpaid balance.

Defendant called Eldred's former secretary as his witness. She testified Eldred told her he was "selling" to Zlaket a series of trust deeds and asked her to type up the assignments. She testified, however, that he never showed her the "Ninety

Day Agreements'' executed in connection therewith. His secretary in charge of collections testified she received several irritating telephone calls from Zlaket wanting to know if Eldred had collected certain payments of interest and principal on the notes held by him, and wanted to know why Eldred was accepting payments from them and why Eldred had not sent out notices to them of the assignments to Zlaket; that she told Eldred of the calls and he said nothing.

It appears to us that the question of the veracity of the parties to these transactions was one for the determination of the trial court and it cannot be said, as a matter of law, that the testimony of Eldred was inherently improbable, as contended by defendant, even though it was impeached by proof of a conviction of a felony.

██ It is true that it has been held in certain cases that where a conveyance is absolute in form with an option to repurchase, the one asserting that it is a loan must establish that fact by evidence which is clear and convincing. (*Cannon* v. *Seattle Title Trust Co.* (1927), 142 Wash. 213 [252 P. 699]; *O. A. Graybeal Co.* v. *Cook*, 111 Cal.App. 518, 529 [295 P. 1088]; *Milana* v. *Credit Discount Co.*, 27 Cal.2d 335 [163 P.2d 869, 165 A.L.R. 621]; *Terry Trading Corp.* v. *Barsky*, 210 Cal. 428, 433 [292 P. 474].)

██ Whether or not the evidence received is clear and convincing is usually a question of fact for the trial court and upon conflicting evidence it is not ordinarily open to review on appeal. (*Brison* v. *Brison*, 90 Cal. 323, 334 [27 P. 186]; *Couts* v. *Winston*, 153 Cal. 686 [96 P. 357]; *Beeler* v. *American Trust Co.*, 24 Cal.2d 1 [147 P.2d 583]; *Beckman* v. *Waters*, 161 Cal. 581 [119 P. 922]; *Garrick* v. *J. M. P., Inc.*, 150 Cal.App.2d 232 [309 P.2d 896].)

██ After reviewing the entire evidence there are also many circumstances to be considered in connection with the testimony of Eldred in support of the court's findings. (1) All of the notes provided for monthly payments of principal and/or interest and after the assignments to Zlaket Eldred continued to collect the monthly payments and turned them over to Zlaket. (2) There was great disparity between the value of the individual notes and deeds of trust, as reflected by an exhibit in evidence. It also showed the consideration passing from Zlaket to Eldred on acquiring them, and from Eldred to Zlaket upon Eldred reacquiring them, which might well indicate Eldred would undoubtedly repurchase them within the term period required. (*Lynch* v. *Lynch*, 22 Cal.App.

653 [135 P. 1101]; *Husheon* v. *Husheon,* 71 Cal. 407 [12 P. 410]; *Orlando* v. *Berns,* 154 Cal.App.2d 753 [316 P.2d 705]; *Beeler* v. *American Trust Co.,* 24 Cal.2d 1 [147 P.2d 583]; 17 Cal.Jur. 788, § 88; 33 Cal.Jur.2d § 49; 90 A.L.R. 953, 963.) (3) In no case did Eldred allow Zlaket to retain the notes and trust deeds, but in all 16 cases he did obtain a reconveyance. (4) The "Ninety Day Agreements" provided that the trust deeds were to be reconveyed to Eldred upon payment to Zlaket of the precise amount Zlaket had paid, plus interest, plus 10 per cent of the purchase price and 2 per cent service charge. (*Farmer* v. *Grose,* 42 Cal. 169; *Hickox* v. *Lowe,* 10 Cal. 197; *Lee* v. *Evans,* 8 Cal. 424.) (5) Zlaket knew that persons other than Eldred were or might be interested in the title to the deeds of trust, thus showing he expected Eldred to redeem.

■ Conveyances absolute on their face may be shown to be in fact loans or security transactions. (17 Cal.Jur. 735, § 41 et seq.; 33 Cal.Jur.2d 421, § 1 et seq.; *Beckman* v. *Waters,* 161 Cal. 581 [119 P. 922]; Civ. Code, § 2925.)

■ The court was justified in finding that the essential elements of usury, as set forth in *Shelley* v. *Byers,* 73 Cal. App. 44 [238 P. 177]; and 165 A.L.R. 628, relied upon by defendant, had been sufficiently established.

■ One other question raised by defendant involves the ownership of the security pertaining to about five of these notes and trust deeds in which Eldred assigned or attempted to assign the notes and trust deeds and a "Ninety Day Agreement" to repurchase, which recite "A. G. Eldred for ———," the trustors named. It appears that these trust deeds and notes were originally in the possession of Eldred either by purchase or assignment and he did attempt to assign them to Zlaket by virtue of such ostensible authority for the purpose of securing money, either as a loan or as a sale. The consideration was paid to Eldred and not to the trustors. They were repurchased by Eldred and he paid the repurchase price demanded. There is no evidence that anyone else paid the amount claimed to be usurious. There is no merit to defendant's claim that the evidence established a direct sale by the trustors to Zlaket.

Certain exhibits were before the trial court and a compilation of them is set forth in respondent's brief. It shows the original principal amount of each note, the balance due thereon, date of transfer to Zlaket, consideration paid by him, date Eldred repaid Zlaket on the repurchase, amount he paid,

amount Zlaket gained by the transaction, and the period his money was used. The court made findings as to the amount due on each of the transactions respecting usurious interest, and no complaint is made in the briefs as to this computation, or in fixing the amount due in accordance with the usury law, sections 1916, 1916-2, and 1916-3 of West's Annotated Civil Code [section 1916 of the Civil Code and sections 2 and 3, Stats. 1919, p. lxxxiii, Deering's Gen. Laws, Act 3757].

Judgment affirmed.

Mussell, J., and Shepard, J., concurred.