**In re SONOMA V, a California general partnership, Debtor.**

**ROCKEFELLER CENTER CONSTRUCTION CORPORATION OF CALIFORNIA, a corporation, Defendant-Appellant,**

v.

**SONOMA V, a California general partnership, Plaintiff-Appellee.**

**BAP No. NC–81–1178 VEK.**
**Bankruptcy No. 1–80–00463.**
**Adv. No. 1–80–0097.**

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued Jan. 20, 1982.

Decided Aug. 27, 1982.

Harlow P. Rothert, Hancock, Rothert & Bunshoft, San Francisco, Cal., for defendant-appellant.

Malcolm A. Misuraca, Misuraca, Beyers & Costin, Santa Rosa, Cal., for plaintiff-appellee.

Before VOLINN, ELLIOTT and KATZ, Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

Sonoma V, a general partnership, was a developer of a shopping center known as the Sonoma Marketplace. Rockefeller Center Construction Corporation of California (Rockefeller), is a general contractor. Sonoma V and Rockefeller entered into three contracts with respect to the Sonoma Marketplace: a contract executed on March 17, 1979, for site work; a basic building shell contract executed on March 13, 1979; and a contract for tenant improvements signed on March 30, 1979. Sonoma chose Rockefeller after receiving bids from qualifying contractors.

Rockefeller appeals from a judgment of the Bankruptcy Court in favor of Sonoma V. Aside from Rockefeller's claim to prejudgment interest on amounts Sonoma owed on the building shell and site work contracts, the issues in the instant appeal involve the tenant improvement contract.

## I. FACTS

Rockefeller agreed to build the tenant improvements for a lump sum of $232,666. This amount was reduced to $192,166 by subsequent agreement, following removal of the fire sprinkler system. The parties used the standard "Stipulated Sum Contract" drafted by the American Institute of Architects. The tenant improvement contract was based upon a typical space of 1600 square feet with specified standard improvements. This was called the T–1. The standard materials were itemized on a unit price list which was attached to and made part of the tenant improvement contract. The parties intended that the unit price list be used when, and to the extent, that actual tenant improvements varied from the standard T–1. When items were used which were not on the unit price list, Rockefeller was entitled to charge the cost of the item plus 15%. If more standard items were used, Rockefeller would be entitled to the price on the unit price list. Conversely, if changes from the T–1 resulted in the reduction of items (i.e., toilets or lighting fixtures), or where different items were used, Sonoma was entitled to an adjustment in the base contract price reflecting the reduced cost.

Rockefeller began work on the tenant improvements in late September or early October, 1979. It continued to perform until March, 1980. At that time, it left the job. Rockefeller and some of its subcontractors filed liens against the project. The bank then refused to disburse further funds under the construction loan agreement. Mounting financial problems led Sonoma to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 16, 1980.

Rockefeller filed a proof of secured lien claim in the amount of $412,130.30. Sonoma filed a complaint objecting to Rockefeller's failure to pay subcontractors and materialmen who filed liens against the project, and for a set-off or damages incurred as a result of Rockefeller's breach of

contract. After a lengthy trial, the court entered judgment on June 24, 1981, in favor of Sonoma V for $248,937. This sum was reduced by amendment and stipulation to $156,546, which included damages for Rockefeller's breach of the tenant improvement contract and attorneys' fees for Sonoma V in the amount of $78,187.

## II. ISSUES

Rockefeller appeals this judgment, asserting that the evidence does not support the finding that it breached the tenant improvement contract; that it is entitled to receive the reasonable value of the improvements it made; that even if it did breach the tenant improvement contract, the breach did not proximately cause Sonoma to suffer damages; that Rockefeller should have been awarded prejudgment interest on liquidated claims Sonoma owed it for work performed under the site work and shell contracts; and that Sonoma is not entitled to attorney fees.

■ Rockefeller prefaces all of its arguments with the assertion that the trial court's findings of fact and conclusions of law are clearly erroneous. These arguments are to be considered in the light of the following standards. Bankruptcy Rule 810 adopts Rule 52(a) of the Federal Rules of Civil Procedure which provides the standard of review with respect to a trial court's findings of fact. Reversal is warranted only where the findings are clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746; *Purex Corp. v. Procter & Gamble Co.,* 664 F.2d 1105 (9th Cir. 1981). The party seeking to reverse findings of fact of a Bankruptcy Court has the burden of demonstrating that the findings are clearly erroneous. A mere showing that the Bankruptcy Court could have reached another conclusion is not sufficient to warrant reversal. *In re Huntington Ltd.,* 654 F.2d 578, 579 (9th Cir. 1981).

## III. DOES THE EVIDENCE SUPPORT THE FINDING THAT ROCKEFELLER BREACHED THE TENANT IMPROVEMENT CONTRACT?

The most significant question Rockefeller raises involves the contract completion date for the tenant finish contract. Rockefeller asserts that the contract required the tenant finishes to be completed by November 1, 1979 and that thereafter, the contract became void and that it could bill Sonoma on whatever basis it chose. Rockefeller states that the "original contract price of $192,166 expired when the contract terminated on November 1, 1979." Accordingly, Rockefeller argues, when Sonoma would not pay it $279,579 upon demand, on March 17, 1980, its abandonment was justified.

The trial court found that although November 1, 1979, was a tentative target date, it was not the contractual termination date. Further, the court stated that "Rockefeller might have negotiated after November 1 with Sonoma for a reasonable adjustment of the base contract price", and that "Sonoma V had offered such an adjustment when the contract was made in the event that the tenant finishes were not completed by November 1." But Rockefeller failed to take any reasonable steps to amend the contract and, in fact, led Sonoma to believe that the contract price was still in effect after November 1.

Under Article 3 of the tenant improvement contract, which is subtitled "Time of Commencement and Completion", the following statements are found:

"Upon completion of building shell and not later than November 1, 1979.

Subject to Leasing Arrangements Per Construction Loan Agreement With Bank of America."

Rockefeller prepared the contract and the president of Rockefeller, Charles Saunders, added the handwritten phrase "Subject to . . . ." The shell work contract provided that the shell work would begin upon completion of the pad construction and that it would be completed by November 1, 1979.

The site, shell and tenant improvement contracts were necessarily sequential. Rockefeller knew, at the time it entered into the contracts, that the shopping center was not leased and that the rate of leasing might delay the tenant finishes beyond the November 1 target date. The handwritten language added to the contract by Saunders was meant to protect Rockefeller from any duty to build unleased tenant improvements since, under the construction loan agreement, the bank was not obligated to release funds for improvements for unleased tenant space. The record clearly supports these findings.

On November 13, 1979, Rockefeller submitted a request for partial payment of $23,803. This billing was based upon 13% of the total contract price and was not supplemented with the data, with respect to changes from the T–1, which was required under the contract. Although Sonoma authorized this payment and the bank paid it, Sonoma demanded that Rockefeller provide the data, with respect to deviations from the standard T–1. Other evidence, including correspondence between the parties and internal memos indicate that Sonoma frequently requested this data and that Rockefeller promised to provide it.

The record clearly supports the crucial finding that the parties knew and accepted the fact that November 1 was not a realistic completion date. Further, the evidence supports a finding that the contract terms prevailed beyond November 1, 1979, pending further negotiations.

In examining the record, which includes approximately 1000 pages of transcript and over 100 exhibits, including correspondence, memoranda, contracts, and invoices, we cannot say that the trial court's findings, with respect to the termination date of the contract, the failure of Rockefeller to properly administer the contract and to account, and Rockefeller's unilateral rejection or abandonment of the contract while leading Sonoma to believe the original contract was still in effect, are clearly erroneous. The court's ultimate conclusion, that Rockefeller breached the contract, is supported by the evidence and reasonable under the circumstances.

## IV.  DAMAGES

■ Rockefeller contends that the trial court erred in allowing it a credit of only $114,535 rather than the reasonable value of the work performed. Where a breaching party has been unjustly enriched through wrongful conduct, recovery in *quantum meruit* by the nonbreaching party is appropriate. *United States v. Mountain States Constr. Co.*, 588 F.2d 259, 262 (9th Cir. 1978). Rockefeller cites no cases which hold that the breaching party is entitled to such recovery.

The court allowed Rockefeller a credit of $114,535. This amount is based upon competent evidence. Lee Saylor, Sonoma's expert, prepared a document, which Sonoma introduced into evidence, in which he calculated the amount due Rockefeller for work performed. Saylor explained his estimate at trial. Since Rockefeller completed 54% of the tenant finishes, it is entitled to 54% of the $192,166 contract price or $103,764. After figuring the deviations from the standard T–1 space on improvements constructed by Rockefeller, Saylor estimated that Rockefeller was entitled to an additional $10,765. Thus the court gave Rockefeller a credit of $114,529 for tenant improvements performed by Rockefeller.

■ Sonoma points out that in order to recover on a contract, Rockefeller has a duty to account. Where a contract requires an accounting as a condition precedent to payment, the failure to do so excuses the other party from performance. Moreover, where, as here, an owner failed to make progress payments because the contractor has not submitted the type of accounting required under the contract, the contractor is not in a position to rescind the contract" "and sue for the amount claimed to be due him upon quantum meruit by reason of the fact that he had failed under said circumstances to receive said payment." *Sinnott v. Schumacher*, 45 Cal.App. 46, 187 P. 105, 108 (1929).

■ The cases which indicate that Rockefeller might be entitled to recovery for the reasonable value of the work performed deal, for the most part, with the doctrine of substantial performance. Rockefeller does not assert that it substantially performed. Even then, the appropriate measure of recovery would be a ratable portion of *the contract price*. *U.S. Industries Inc. v. Edmond J. Vadnais, General Con.,* 270 Cal. App.2d 520, 76 Cal.Rptr. 44, 50 (1969). This was the rule applied by the trial court.

## V. DID ROCKEFELLER'S BREACH PROXIMATELY CAUSE SONOMA TO INCUR INTEREST CHARGES DURING THE PERIOD OF DELAY?

■ The trial court awarded Sonoma $98,624 for interest costs incurred from the time that Rockefeller abandoned the job in March, 1980 to the time that the replacement contractor, La Casa Builders, began in July, 1980. Rockefeller contends that even if they breached the contract, the interest costs were not proximately caused thereby.

The test for determining whether particular damages are recoverable in a breach of contract action is stated in 1 Witkin, Summary of California Law (p. 306) as follows:

In *Hadley v. Baxendale,* (1854) 9 Ex. 341, 156 Engl.Rep.R. 145, the court announced the doctrine still generally accepted as a limitation on damages recoverable for breach of contract: First *general* damages are ordinarily confined to those which would *naturally arise* from the breach, or which might have been reasonably contemplated or forseen by both parties, at the time they made the contract, as the *probable result* of the breach. Second, if *special circumstances* cause some *unusual* injury, special damages are not recoverable therefor unless the circumstances were *known* or *should have been known* to the guilty party at the time he entered into the contract.

In *Mendoyoma, Inc. v. County of Mendocino,* 8 Cal.App.3d 873, 87 Cal.Rptr. 740 (1970) the California court disallowed recovery for the expenditure of interest which the trial court had awarded the owner. As in the instant case, the contractor had abandoned the job and the owner had to find a new contractor to complete the work. In *Mendoyoma,* the court stated that the "record is devoid of any evidence that performance of the contract was to be financed through loans." *Mendoyoma, supra* at 880, 87 Cal.Rptr. 744. Therefore, reasoned the court, the fact that the builder would have to borrow money to complete the project and the consequent obligation to pay interest was not foreseeable.

In the instant case, however, Rockefeller had signed the construction loan agreement and was aware that Sonoma was paying interest on the loan. The interest recovered by Sonoma only covers the period between the time that Rockefeller abandoned the job to the time that Sonoma hired a new contractor to complete the project. The process took four months. Clearly, Rockefeller could reasonably foresee that Sonoma would incur interest charges and that by leaving the job there would be a period during which no progress could be made on the project although the interest costs would continue. Although Sonoma would have had to pay the interest during those four months even if Rockefeller had stayed on the job, their abandonment put the project behind four months.

Rockefeller stated that "there was nothing to prevent Sonoma from hiring a contractor promptly after Rockefeller left the job in March, 1980." The evidence is to the contrary. The Bank of America would not release any funds because Rockefeller had filed liens against the project for more than $400,000. Sonoma had to enter into negotiations with prospective replacement contractors and draft a new contract. We believe that the award of interest for the four-month period was reasonable.

The court awarded Sonoma other damages. Rockefeller does not specifically challenge these. We therefore decline to review them.

## VI. IS ROCKEFELLER ENTITLED TO PREJUDGMENT INTEREST?

■ Rockefeller contends that it should receive pre-judgment interest with

respect to liquidated claims arising out of the contracts for site work and building shell work. Under California law pre-judgment interest is recoverable where the claim is certain or can be calculated. *Conderback, Inc. v. Standard Oil Co.,* 239 Cal. App.2d 664, 690, 48 Cal.Rptr. 901, 918 (1966).

Section 3287(a) of the California Civil Code provides in part:

> Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt.

Rockefeller contends, however, that cases which deal with liquidated claims being set off by unliquidated claims specifically involve opposing claims arising out of the same contract:

> It is settled that when a plaintiff sues for a liquidated sum and the defendant establishes an offsetting claim based upon *defective ... performance of the same contract* by the plaintiff, the amount of the former is to be off-set against the latter as of the due date of the original debt and only the balance bears interest. *Burgermeister Brewing Corp. v. Bowman,* 227 Cal.App.2d 274, 38 Cal.Rptr. 597, 604 (1964). (Emph. supp.)

In *General Ins. Co. of America v. Commerce Hyatt House,* 5 Cal.App.3d 460, 473, 85 Cal. Rptr. 317, 327 (1970), the court, when discussing the issue of pre-judgment interest awards where unliquidated claims were off-set against liquidated claims again pointed out that the case involved claims arising out of a single construction contract. See also *Burnett & Doty Dev. Co. v. C.S. Phillips,* 84 Cal.App.3d 384, 148 Cal.Rptr. 569, 573 (1978).

Although the liquidated claims of Rockefeller appear to arise out of contracts other than the contract from which the unliquidated claims of Sonoma arose, we think Rockefeller it not entitled to receive pre-judgment interest in this case. Rockefeller filed a lien in the amount of $253,398 on March 31, 1980 which took into consideration all credits and offsets due Sonoma V.

On May 15, 1980 Rockefeller filed another lien for $446,559. In this second claim Rockefeller stated that the claim was based on "[t]he contract price, which is the reasonable value of all labor, services, equipment and materials required in order to construct the buildings and other improvements for the Shopping Center ... including ... site work, base building shells, ... and tenant improvements." Furthermore, in their answer to Sonoma's complaint challenging their claim, Rockefeller entered a general denial and requested that its claim, in the amount of $412,130.30 be allowed.

In our view, although the claims and counterclaims arose out of three contracts, Rockefeller elected to treat them as if they arose out of the same contract. The contracts, while separate, are interrelated and involve the same project, and since Rockefeller consolidated their claims arising thereunder, it cannot seek refuge under the rule that would allow it pre-judgment interest on the two liquidated claims.

Sonoma also points out that although a liquidated sum is not rendered unliquidated by the presence of unliquidated offsets, no interest is due on the liquidated sum until the offsets are first deducted. Interest is due only on the net amount. *Hansen v. Covell,* 218 Cal. 622, 630–31, 24 P.2d 772 (1933); *Leaf v. Phil Rauch, Inc.,* 47 Cal. App.3d 371, 120 Cal.Rptr. 749 (1975).

The rule that a claimant is only entitled to interest on the balance of the original liquidated amounts found to be due after deducting the allowable cross demands pertains. Since Sonoma V's judgment has totally consumed the two liquidated claims of Rockefeller, and since Rockefeller is only entitled to interest on the net amount due, the trial court properly denied any credit to Rockefeller for pre-judgment interest on the liquidated claims.

## VII. *ATTORNEY'S FEES*

Rockefeller asserts that Sonoma is not entitled to attorney's fees. We agree.

Where a federal court exercises diversity jurisdiction in an otherwise state law action, state law with respect to attorney fee awards applies. *Alyeska Pipeline Co. v. Wilderness Society,* 421 U.S. 240, 259 n. 31, 95 S.Ct. 1612, 1622 n. 31, 44 L.Ed.2d 141 (1975). The same rule should apply when a federal bankruptcy court exercises jurisdiction over a dispute involving state law.

In California the prevailing litigant is entitled to attorney's fees only if they are provided by statute or contract. Cal.Civ. Code § 1717; Cal.Code Civ.Proc. § 1021.

■ The trial court found that Sonoma was entitled to attorney's fees under the construction loan agreement. The primary purpose of this agreement, to which the Bank, Sonoma and Rockefeller were parties, was to define their respective duties as to when and how the bank would disburse funds and how they would be applied by the developer and contractor. While this agreement provided for attorney's fees and contained a provision that it applied to "any other agreement required hereunder", it essentially created rights and responsibilities between Sonoma and the Bank and between Rockefeller and the Bank. It was not designed to create reciprocal rights and obligations between Sonoma and Rockefeller. None of the construction contracts between Sonoma and Rockefeller provided for attorney's fees in the event of litigation. Consequently, we find no contractual basis for the award of fees to Sonoma.

■ Sonoma contends that since Rockefeller prayed for attorney's fees in its pleadings and asserted its rights thereto on the same grounds that the trial court awarded fees to Sonoma, Rockefeller should be estopped or precluded from changing its position. Although an admission of fact in a pleading is generally binding, a mistaken legal position is not. We conclude that there is no legal basis for the award of attorney's fees.

Accordingly, the trial court is reversed with respect to the attorney fee award to Sonoma. In all other respects, we affirm the decision of the trial court.