Joseph N. FOX, Trustee of Scrap Disposal, Inc., a California corporation, Plaintiff,

v.

PECK IRON AND METAL COMPANY, INC., a Virginia corporation, Defendant.

Complaint No. C80–0253–M.

Bankruptcy No. 80–01270–M11.

United States Bankruptcy Court, S.D. California.

Dec. 22, 1982.

Jay D. Hanson, Jan S. Gonnerman, Gray, Cary, Ames & Frye, San Diego, Cal., for plaintiff.

Edgar P. Boyko, Fletcher W. Paddison, Miller, Boyko & Bell, San Diego, Cal., for defendant.

## MEMORANDUM OPINION

JAMES W. MEYERS, Bankruptcy Judge.

### I

On May 16, 1980, the debtor, Scrap Disposal, Inc. ("Scrap"), filed for protection under Chapter 11 of the United States Bankruptcy Code ("Code").

On July 2, 1980, the debtor filed the initial complaint in this case. The defendant, Peck Iron and Metal Company, Inc. ("Peck"), filed its answer on August 22, 1980.

On November 2, 1980, the debtor filed a motion for summary judgment. On January 8, 1981, the debtor moved for permission to file an amended complaint. On January 13, 1981, Peck filed its own motion for summary judgment and its opposition to the filing of an amended complaint. These matters came on for hearing before this Court on January 29, 1981, at which time this Court denied the motions for summary judgment and granted leave to the debtor to file an amended complaint. Peck filed its answer to this complaint on March 2, 1981.

On March 20, 1981, the Court appointed Mr. Joseph N. Fox to act as Chapter 11 trustee.

The case came on for trial before this Court, sitting without a jury, on September 10, 1981. The trial continued on September 11, 16 and 17.

On September 10, 1981, Peck filed another motion for partial summary judgment and for judgment on the pleadings. These motions came on for a hearing before this Court on September 29, 1981, and were taken under submission. Peck filed yet another motion for summary judgment on November 9, 1981, which was denied by this Court after a hearing.

The trial continued on November 30 and December 1, 2, 3 and 4, 1981.

On December 15, 1981, the plaintiff's motion to file a second amended complaint was granted.

Trial continued on February 9, 10, 11, 12, 16 and 17, 1982. The final arguments were heard on February 23, 1982. At the conclusion of the trial, the parties were directed to submit closing briefs and further evidence in the form of edited transcripts of certain deposition testimony. Peck filed its closing brief on March 26, 1982, while the trustee filed its supplemental argument on March 29, 1982. Thereafter, the edited transcript of the testimony of Mr. Wynn Williams was filed on April 19, 1982.

On September 13, 1982, this Court filed its initial memorandum decision announcing findings of fact and conclusions of law. On September 24, 1982, the trustee filed a motion to alter and amend these findings and conclusions and to consider the question of the award of attorneys' fees and other costs of litigation. This motion came on for a hearing on October 12 and 28, 1982. At the last hearing the parties were granted leave to file further memorandums, with the last pleading being filed on November 17, 1982.

### II

## SECOND AMENDED COMPLAINT

The trustee's second amended complaint contains four causes of action. They each are concerned with a transaction originating on August 6, 1976.

The first cause of action claims that the structuring of the deal, as a sale from the debtor to Peck and a subsequent leaseback, was a sham intended to disguise the true nature of the transaction, which the trustee claims was a financing scheme for the sale of a Harris Automatic Baler Shear ("Shear") and a loan secured by real and personal property. The trustee urges this Court to make findings declaring the true nature of the transaction, and to enter other appropriate relief.

The second cause of action claims that the payments made by the debtor and the trustee to Peck were interest payments in excess of the legal limit, under California

law, and that this Court should grant the estate damages, which would be treble the amount of the payments from July 2, 1979.

The third cause of action claims that the payments made to Peck after May 16, 1980, constitute unlawful preferential distributions, and damages should be awarded in favor of the estate.

The last cause of action claims, in the alternative, that if a *bona fide* sale/leaseback, then the transaction did not comply with the requirements of California fraudulent conveyance statutes (*see* California Civil Code Section 3440(h)), so that this Court should award damages in favor of the estate.

Peck filed its answer to this version of the complaint on January 5, 1982. The answer disputed the allegations contained in the complaint and asserted ten affirmative defenses.

### III

### OTHER RELATED PROCEEDINGS

From an early point in these proceedings the debtor, and then the trustee, have been faced with a considerable dilemma, given their theory of the estate's legal rights in regard to Scrap's transactions with Peck. Even though the transactions were denominated a sale of Scrap's assets to Peck with a leaseback to Scrap, the debtor has argued that this was actually a disguised financing arrangement. The problem presented centered on the option provision contained in the lease agreement which allowed Scrap to buy back the real estate and equipment, by paying $2,045,000, or exchanging real estate. The payment, or exchange, was to take place within 366 days, subsequent to notice of intent to exercise the option. Scrap had given such notice on December 5, 1979.

On November 21, 1980, apparently in an effort to protect the estate's rights under the option, the debtor filed a motion to assume the lease as an executory contract. In bringing that motion, the debtor express-

ly reserved its rights to contest the true nature of the Peck deal, a question then pending before this Court in this litigation. In its moving papers, the debtor offered to post an irrevocable Wells Fargo Bank letter of credit for $2.3 million to provide the necessary adequate assurance required by the Code. *See* 11 U.S.C. § 365(b)(1). The letter of credit was offered to cover the option price of $2,045,000 and any arrearages under the contract. Peck opposed this motion, which initially came on for hearing on November 25, 1980, and was continued to December 16, 1980, to allow for discovery to be completed, the preparation of legal memorandums and a pre-hearing conference.

The motion was heard on December 16, 17, 19 and 23, 1980. On January 6, 1981, this Court filed its order allowing the debtor to assume the Peck lease, conditioned on the debtor posting a commitment letter for $2.3 million from the Wells Fargo Bank. The debtor was not required to make any exchange, or payment, to Peck until this Court rendered judgment in this complaint, or until six months had passed. If payment was required before judgment, then this Court retained the power to equitably adjust the rights of the parties. In addition, Western States Investment Corporation ("Western States"), the owner of the debtor, was required to deposit a written guaranty of up to $300,000 to cover any amounts over $2.3 million, which this Court might find to be owing to Peck, after trial of this complaint. On January 16, 1981, Peck filed a notice appealing this Court's order, allowing assumption of the lease contract, to the Bankruptcy Appellate Panel for the Ninth Circuit ("Appellate Panel").

On May 15, 1981, after a hearing, this Court filed an order confirming the sale of the bulk of the assets of the estate to Western States, or its nominee, for $2.6 million.[1] Since this was subject to any interest or claim of Peck, Western States was required to provide the adequate assurance cited in this Court's order of January 6, 1981, if it wished to have the sale free and

---

1. Peck appealed this order on May 26, 1981.

clear of the Peck claim. To this end, as required by this Court to protect Peck, Western States caused $2.6 million to be deposited into the escrow opened to handle the sale, and posted with the trustee letters of credit for $2.3 million, and the necessary guarantee. Thus, on July 16, 1981, this Court filed detailed findings of fact and conclusions of law with its order giving final authorization to the closing of the sale, free and clear of Peck's interest, to Western States' nominee, San Diego Steel, Inc. As of this date, a total of $5.2 million in cash, letters of credit and guarantees was required to be posted in order to cover the sale of the assets and to provide adequate protection for Peck's claims.

Subsequent to the entry of the order confirming the sale, Peck demanded to be paid the $2.3 million posted to provide protection for its interests. Six months having passed since this Court determined the mode of adequate assurance of their interest, then the funds were allowed to be paid over to Peck. This payment, of course, is subject to further review after judgment is entered in this proceeding.

On October 28, 1981, the Appellate Panel issued its opinion on Peck's initial appeal of this Court's order allowing assumption of the lease, remanding to this Court. *In re Scrap Disposal, Inc.,* 15 B.R. 296, 8 B.C.D. 504 (9th Cir.B.A.P.1981). In its opinion, the Appellate Panel rejected Peck's argument, regarding the election of remedies, by noting that Scrap could seek relief under alternative theories. 15 B.R. at 297, 8 B.C.D. at 506. However, the Appellate Panel remanded the case directing that the debtor should seek its relief in one proceeding. In this, the Appellate Panel ordered that:

> [t]his matter is remanded to the trial court. If that court rules in the declaratory relief action that the sale and leaseback with option was a disguised mortgage or security agreement, the order permitting assumption of the executory contract should be vacated and the underlying motion denied. If the trial court rules that the transaction was a true sale and leaseback, then the court should make appropriate findings of fact and conclusions of law supporting the order permitting assumption of the executory contract.

15 B.R. at 297–8, 8 B.C.D. at 506.

## IV

## FACTS

**A. *Preliminary Issue—Admissibility of Exhibit 24***

A difficult problem faced by the Court, concerns the admissibility of Exhibit 24, which Mr. Williams stated was handed to him by Mr. Stanley Peck, the son of the President of Peck, to account for a side arrangement to the sale/leaseback between Scrap and Peck. Mr. Williams claimed that Peck demanded payments of $387,425, be paid directly to him in cash. These payments were not disclosed in any of the documents reflecting the transaction. These cash payments were supposedly an additional $50,000 for the purchase of the shear and $337,425 in advance, as an additional six and one-half per cent return on the $1.6 million advanced by Peck. The document offered is a photostatic copy. The original purportedly shows the cash payments made to Mr. Peck, including several made after the copy was created.

This Court is faced with determining whether the exhibit is sufficiently authenticated to consider it in making findings of fact. *See* Federal Rules of Evidence 901 and 1003. In a case tried to a jury, it is for the trial judge to determine whether there is *prima facie* evidence to show that the document is what it is purported to be and, for the jury, as the trier of fact, to make its own determination of the authenticity of the evidence and the weight which it believes it should be accorded. *See* Federal Rule of Evidence 1008; *Alexander Dawson, Inc. v. N.L.R.B.,* 586 F.2d 1300, 1302 (9th Cir.1978); *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1190, 1219 (E.Pa.1980). As to the question of the existence of a *prima facie* showing, all that is required is substantial evidence from which the trier of fact might conclude that the document is authentic. *Id.*

The process is changed considerably when the case is tried before the Court, sitting without a jury. In such cases, the Court itself must make both the preliminary and final factual determinations. *In re James E. Long Const. Co., Inc.,* 557 F.2d 1039, 1040–41 (4th Cir.1977). It becomes part of the Court's duty, as fact finder, to pass on the credibility of the witnesses, taking account of their appearance and conduct on the witness stand, their interest or lack of interest in the result of the trial, their motives, candor and fairness, and the reasonableness or probability of their statements. *Sedco Intern., S.A. v. Cory,* 522 F.Supp. 254, 287 n. 35 (S.Iowa 1981). In non-jury cases, the Court has been given great latitude in the admission or exclusion of evidence. *Hollinger v. United States,* 651 F.2d 636, 640 (9th Cir.1981). *See also Waste Management, Inc. v. Deffenbaugh,* 534 F.2d 126, 130 (8th Cir.1976); *Alioto v. Cowles Communications, Inc.,* 623 F.2d 616, 620 (9th Cir.1980).

■ Here, the Court recognizes the handicaps under which the trustee labors, for he was not a direct participant in the formation of the association between Scrap and Peck. His position is further hindered by the obvious lack of cooperation shown by Mr. Williams. However, it is on Mr. Williams' broad shoulders that the trustee must place the burden of making the necessary *prima facie* showing regarding the authentication of this exhibit. To bolster Mr. Williams' testimony, which on its face presents a *prima facie* case, the trustee has presented other evidence directed to proving the existence of the original, at a point in time long before trial, and towards proving the cash payments that this record allegedly memorializes. As revealed in this opinion, this Court does find that a number of cash payments were made directly to Mr. Peck. Even though Mr. Williams' testimony is confirmed on this point, after considering all the evidence, this Court cannot find Mr. Williams to be generally a trustworthy witness. Given this lack of credible evidence, this Court cannot find a basis for admission of this copy of a suspect document, which has not been directly tied to any hand.

Further, given the state of the record, it would be manifestly unfair to admit this duplicate where the original could be of such value in ascertaining its authorship.

Counsel for the trustee urges this Court to receive the document and then accord it the weight that it deserves. This approach must be rejected, for it would unduly complicate the issues and constitute an additional burden on the Court. Simply stated, since this Court would give no weight to Exhibit 24, then there is no rational reason to admit it in the first instance.

### B. *Details*

Scrap was formed in May of 1955 to purchase and operate a scrap yard which had been in operation since the early Twenties. In 1976, Scrap's main business was running the scrap yard located in National City, California. As usual, it was short of cash, being in desperate need of working capital. In the Spring, Scrap had started seeking financing to pay off a large obligation to Toyomenka (America), Inc. ("Toyomenka"), a Japanese trading company, and for other operating purposes. Scrap's President, Mr. Wynn D. Williams, had informed his longtime acquaintance, Mr. Allan Epstein, a dealer in surplus marine supplies, of Scrap's financial predicament. Mr. Epstein had a long-standing relationship with Mr. Julius Peck, President of Peck, and through this association, Mr. Epstein was privy to the facts that Peck had recently sold some real property and had funds available.

In 1973, the Philip Morris Company ("Philip Morris") was building the world's largest tobacco processing plant in Richmond, Virginia. This plant was being constructed on land adjacent to a scrap yard that Peck then operated in that historic city. The management of Philip Morris was anxious to remove the scrap yard operation, as they considered it an eyesore. Peck agreed to sell the property to Philip Morris, with the deal to be concluded in 1976. Since Peck had owned this property for many years, it had a small tax basis, which would have resulted in a large taxa-

ble capital gain if the transaction were an outright sale. It was agreed that Peck would be allowed to arrange exchanges of Peck's interest for other like properties, which, under Section 1031 of the Internal Revenue Code, would defer the tax consequences of the sale. By 1976, Peck had already completed several exchanges, but still had approximately $1.6 million coming from Philip Morris, of which, approximately $1.2 million represented potential capital gain, if an appropriate exchange was not arranged.

Messrs. Epstein and Williams journeyed to Portsmouth, Virginia, where they met with Mr. Julius Peck. Mr. Williams stated Scrap's need for cash and asked for a loan.[2] Mr. Peck agreed to provide the funds, even though Peck was generally not in the business of lending money. However, Mr. Peck would not commit himself until he had seen Scrap's assets and was thereby assured that they were of sufficient value to provide adequate "security." Mr. Williams urged that the deal be completed quickly, as Scrap needed the funds to pay off Toyomenka. At this preliminary stage, Mr. Peck also agreed that if the deal was arranged, Scrap would be allowed to renew the arrangement after the initial term expired.

Mr. Peck and Mr. Raymond Gottlieb, who acted as an attorney and business advisor to Peck, traveled to National City to inspect the Scrap plant and equipment. They visited the scrap yard for less than two hours and noted that it was a relatively small yard.

As the negotiations progressed, Mr. Gottlieb was assigned the task of preparing the necessary documents reflecting the agreements of the parties. In this, Mr. Gottlieb knew that Peck's principal concern was to shelter the proceeds from the Philip Morris deal. Thus, Peck insisted that the deal be structured so that it would be in the position of a purchaser of the property. This was done to insure that Peck would be able to qualify the transaction as a tax-free exchange. To this end, it was agreed that Peck would provide Scrap with $1.6 million and that the transaction would be arranged as a sale to Peck, with a leaseback to Scrap of the assets selected for inclusion in the deal.[3] Mr. Williams directed Scrap's Comptroller, Mr. John D. O'Brien, to determine which assets should be included, in addition to the real property, so that the tax basis of the committed assets would approximate $1.6 million. Mr. O'Brien was directed to convey this information to Peck so that they would know what they had "purchased." The selection of equipment and fixtures to be included in the deal was made in order to keep the tax consequences to Scrap to a minimum. The final list of assets had a tax basis of $1,585,000, even though the fair market value of these assets was substantially in excess of this total, having a fair market value of at least twice the amount received from Peck.[4] The selection resulted in Scrap recognizing a $15,000 taxable gain from the transaction.

As the negotiations drew to a close, the parties discussed a large Harris Automatic Baler Shear that Peck had purchased for $378,500. Peck no longer had any use for this equipment, as it had sold the scrap yard in which it was to be located. Mr. Williams agreed that the deal would include the shear to be valued at $445,000. Peck agreed that Scrap could repurchase all of the property included in the deal, including the shear, for $2,045,000, which represented the cash paid by Peck of $1.6 million, plus the value assigned to the shear of $445,000.

After Mr. Gottlieb drafted the initial version of the documents, Mr. Williams came

2. Mr. Peck had previous contacts with Mr. Williams, as the latter had previously come to Virginia and offered to purchase Peck's operations. At this time, Mr. Peck believed that Mr. Williams could not be serious, for it was not possible to successfully operate scrap yards on both coasts simultaneously.

3. While the parties agreed, at Peck's insistence, that the deal would be couched in terms of a sale and leaseback, Mr. Williams always thought of it as a loan.

4. At that time, when questioned concerning this disparity in value, Mr. Williams said it was no problem as Scrap would retain the right to repurchase these assets.

to Portsmouth to initial them. Once the final documents were prepared by Peck, they were all executed in Virginia, except that Mr. Williams signed for Scrap in California and then sent them back to Virginia for Mr. Peck's signature.

The main document was the lease agreement ("lease") dated August 6, 1976. This document provided for the sale and lease-back of virtually all of Scrap's real property and much of its machinery and equipment. The lease was to run for three years from August 9, 1976 and called for total rental payments of $276,075, at $7,668.75 per month, payable at Peck's offices in Portsmouth, Virginia. It was structured as a "triple net" lease with Scrap being responsible for the payment of real property taxes, repairs and maintenance, utilities and insurance. Among the other provisions was Section 51 which gave Scrap the right to force Peck to transfer the leased property, including the shear, back to Scrap. In payment for this, Scrap would be required to pay to Peck $2,045,000 in cash or certain property, at Peck's pleasure. The option provisions of Section 51 ran from August 6, 1978 and continued during the remainder of the lease as renewed. A parallel provision, Section 30, granted a similar option to Peck which gave it the right to force Scrap to buy back the leased property, and the shear, under the same terms as found in Section 51.

Peck agreed that this "triple net lease" would have an initial three-year term because, as Mr. Gottlieb put it, they did not want to fix themselves "into a unique piece of real property." However, given the tax advantages to Peck, it was satisfied with yearly rents of $92,025, which constituted income of only four and one-half per cent per year based on the $2,045,000 value at-tributed to the assets involved. This rental rate was agreed to even though the market rate of return on such loans, at this time, was eight and one-half per cent. Further, the parties understood that the "put" option contained in Section 30 of the lease would not be exercised for at least two years, as Mr. Williams insisted that Scrap should have the use of Peck's money for at least that length of time.

At the closing, Peck deposited $1.6 million and made the shear available to Scrap. The funds were used to pay the closing costs, pay certain of Scrap's debts, including $987,445.70 to Toyomenka and $94,348.59 to the Wells Fargo Bank, with Scrap receiving the net proceeds of $492,150.74 by a check dated August 11, 1976.[5]

Peck never filed a UCC–1 financing statement concerning any of the assets involved and it never published any notice in California of the intended transfer and leaseback of the personal property. Scrap spent $104,252.50 to bring the shear back to California and place it into production at its yard.

Peck and Scrap coordinated their accounting for the transaction in that they both reflected the transaction in their books of account as a sale of Scrap's assets to Peck and then a leaseback of these assets, plus the sale of the shear, to Scrap. This treatment was also reflected on Scrap's federal tax returns until 1978 when Scrap started to report the Peck deal as a financing arrangement.

In addition to the payments called for under the lease, Mr. Williams committed himself to make a series of cash payments to Peck, which were part of the deal but not disclosed in any part of the documents.

---

**5.** At this time, Scrap shipped an Ogden Kar Press, a portable automobile smasher which had cost $50,160.91, to Peck in Virginia. The trustee argues that this equipment was a further payment on the sale/leaseback transaction. However, the trustee has not sustained his burden of proof to show that this was not a separate transaction, with Scrap receiving compensation for the Kar Press by an exchange transaction with Mr. Epstein, which was committed to writing in an agreement dated March 8, 1977, and executed at Portsmouth. Apparently, this agreement was drafted by Mr. Gottlieb and was just part of a larger exchange transaction, wherein Mr. Epstein then exchanged the Kar Press back to Peck in exchange for a piece of real property located in Los Angeles, which Peck had received in another of the exchange transactions in the Philip Morris sale, and which they carried at a cost of $135,000.

These payments were the focus of a great deal of the testimony presented before this Court. It is clear that some cash payments were in fact made directly to Mr. Peck. The difficulty is this Court's inability to give any credit to Mr. Williams' testimony, except where confirmed by other evidence.[6] This is further complicated by the age of two other important witnesses, Mr. Epstein and Mr. Peck, both of whom are of great age and showed frail memories. However, after considering all of the evidence, this Court stands convinced that on two occasions Mr. Epstein directly conveyed cash from Mr. Williams to Mr. Peck at his office in Portsmouth. The two payments totaled $90,000. On one of these occasions, Mr. Peck complained to Epstein that the payment was in arrears. Mr. Peck also received a $25,000 cash payment directly from Mr. Williams in Las Vegas, Nevada.[7] Further, on February 14, 1979, Mr. Larry Olson, a personal aide to Mr. Williams at Scrap, delivered $10,000 in cash to Mr. Peck in Virginia. In late 1979, Mr. Olson forwarded another $2,000 payment to Mr. Peck via the Federal Express Company delivery service. Thus, these undisclosed cash payments, required by Mr. Peck, totaled $127,000.[8]

A most instructive event took place on November 19, 1977, when Peck and Scrap entered into a modification of the lease. The modification agreement concerned real property located in Compton, California. This property was among those assets transferred to Peck in the sale/leaseback transaction. In October of 1977, Scrap had an opportunity to sell this property and asked Peck to release it.[9] In the modification agreement, Peck agreed to the release in exchange for a nominal one dollar pay-

ment. Shortly after regaining this property, Scrap sold it for $79,000.

In early 1978, Scrap found itself in another cash bind, owing approximately $900,000 to Nissho-Iwai Company ("Nissho-Iwai"), another of Scrap's Japanese trading partners. This debt was the product of advances made to Scrap against future shipments of scrap. However, Nissho-Iwai demanded payment to clear it off its books before the end of its fiscal year. Since Scrap, as usual, was short of cash, Mr. David E. Creigh, the Controller at Scrap since February of 1978, was sent to Virginia to negotiate a loan from Peck. Mr. Creigh suggested that another sale/leaseback deal be arranged using Scrap's Wilmington, California, real estate. Mr. Gottlieb stated that he needed a better feel for the property as Peck's policy was to limit its loans to 50% of the value of the collateral. He also noted that the interest to be charged would be a matter of arrangement between Mr. Peck and Mr. Williams. When Mr. Creigh talked to Mr. Peck, he was surprised when the latter complained about late payments on the first deal, for Mr. Creigh understood that all the payments called for under the lease had been timely made.

After the Wilmington real estate had been appraised, Peck declined to make a loan. Scrap's cash squeeze was then solved when Mr. Williams raised $300,000 in Arizona.

In December of 1978, the parties agreed to a further modification and extension of the original lease agreement. Mr. Gottlieb again drafted the necessary document, which extended the lease another year, with the new expiration date being August 8, 1980. To gain this extension, Peck insisted

---

**6.** While this Court does not find Mr. Williams to be a credible witness, it does believe his testimony that the payments, confirmed in part by Mr. Peck, were another term of the sale/leaseback deal. However, given the doubts that this Court has for Mr. Williams' testimony, all findings that payments were made, are based on the independent confirming testimony of Mr. Epstein, Mr. Olson or Mr. Peck.

**7.** This Court does not credit Mr. Peck's story that these payments were to repay personal gambling loans that Mr. Peck had provided to Mr. Williams.

**8.** This Court finds that Mr. Gottlieb had no knowledge of this "side" deal made by the principals calling for these "under the table" payments.

**9.** Mr. Peck saw this request to be a strong sign that Scrap was in great financial difficulty.

on a significant increase in the rental payments required. The new monthly rental was calculated as one-twelfth of the prime interest rate, charged by the First National City Bank of New York, plus two and one-half per cent, on the base amount of $2,045,000, but in no event could this be less than $20,532.53 per month. This rate was geared to provide Peck with income at 130% of the then prime rate charged by this nation's second largest bank. The modification agreement was sent to Mr. Williams for his signature and then returned to Virginia for Mr. Peck to sign on behalf of his firm.

On December 5, 1979, Scrap gave the required notice under Section 30 of the lease, that it was going to exercise its option to purchase all assets included therein. Before the option was exercised, Scrap filed its petition under Chapter 11 of the Code. Up to the date that it filed its petition, Scrap had paid Peck $701,761.59 in rental payments under the lease, $276,075 of this being thirty-six monthly payments of $7,668.75 each under the initial lease agreement, $298,686.59 in nine rental payments under the extension agreement from August 1979 to April 14, 1980, and the $127,000 in proven cash payments made directly to Mr. Peck.

After the Chapter 11 was filed, pursuant to orders issued by this Court, Scrap paid Peck $69,000 on April 6, 1981, $87,399.99 on July 30, 1981, and $2.3 million by a letter of credit on July 31, 1981. The letter of credit was subsequently fully drawn down on August 3, 1981. During this period, Peck has paid a net of $34,927.50 in real property taxes on the realty located in National City.

## V

## DISCUSSION

### A. Choice of Law

The Code does not provide any direction for determining whether a debtor has an interest in property, or whether it owes a debt. 4 *Collier on Bankruptcy,* ¶ 541.07 at 541–27 (15th ed.). Instead, the Court must look to state law to determine the nature and extent of a debtor's interest in property. *See Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 916–17, 59 L.Ed.2d 136 (1979); *In re Virginia Foundry Co. Inc.,* 9 B.R. 493, 495 (W.D.Va.1981). But, to which state do we look for the applicable legal principles?

In this case, we have a complex transaction between parties located on the opposite shores of the continent. In most such cases, the parties provide guidance by the inclusion of a choice of law clause in their contract, which are generally respected by the courts. *See Sarlot-Kantarjian v. First Pa. Mortg. Trust,* 599 F.2d 915, 917–18 (9th Cir.1979). Here, the parties did not see fit to include such a clause.

Both Virginia and California have strong claims to be the state providing the law to be consulted, given that each has several significant contacts with the transaction. Virginia appears to have the most numerous contacts since it is the jurisdiction in which: Peck is located and conducts business; most of the negotiations took place; the documents were drafted and executed; payments were made; and where notice was to be made regarding any exercise of the exchange option contained in Section 30 of the lease. On the other hand, the most significant contact, the location of the property involved, is in California—which was also the place of Scrap's business; where some of the negotiations were pursued; where the closing took place and the deeds and lease were recorded; and where Mr. Williams signed the December 1978 lease modification. It should also be noted that while the lease required that payments to Peck be made at Portsmouth, Virginia, at least one $25,000 payment was made in Las Vegas, Nevada.

If this Court were hearing this case as a federal district court under its diversity jurisdiction, this conflict of law question would be greatly simplified. When the laws of more than one jurisdiction arguably apply to the issue to be decided, such a court must apply the conflict of laws rules of the state in which the federal court is

located. *American Triticale, Inc. v. Nytco Services, Inc.,* 664 F.2d 1136, 1141 (9th Cir. 1981). *See Matter of Barney Schogel, Inc.,* 12 B.R. 697, 699 (S.N.Y.1981). However, when dealing with a case presented pursuant to the special grant of jurisdiction ceded to the bankruptcy courts, we face a more complicated and unsettled question. Some courts take the position that they must follow the conflict laws of the forum state in determining what law governs the interpretation of any contract. *In re Bagley,* 6 B.R. 387, 389 (N.Ga.1980). While other courts have found that there is no obligation on a bankruptcy court to apply the conflict of laws rules of the forum state. Instead, these courts have determined that the conflict problem as to the choice of state law, should be for the independent determination of the bankruptcy court. 4A *Collier on Bankruptcy,* ¶ 70.04 at 61 n. 31 (14th ed.); *In re Wallace Lincoln-Mercury Company, Inc.,* 469 F.2d 396, 400 n. 1 (5th Cir.1972); *Federal Deposit Ins. Corp. v. Lattimore Land Corp.,* 656 F.2d 139, 143 n. 6 (5th Cir.1981). *See also In re Holiday Airlines Corp.,* 620 F.2d 731, 734 (9th Cir. 1980). These latter cases seem to have determined that there is no reason to apply any rule other than that which the federal court regards as the fairest under the circumstances of the case. *See Note,* 68 Harv. L.Rev. 1212, 1219 (1954); *Matter of Barney Schogel, Inc., supra,* 12 B.R. at 700. It would appear that this divergence of opinion continues, since the Supreme Court and the various circuit courts have taken care to avoid resolving the question. *Woods-Tucker Leasing, Corp., Etc. v. Hutcheson-Ingram,* 642 F.2d 744, 748 (5th Cir.1981). *See In re L.M.S. Associates, Inc.,* 18 B.R. 425, 428 (S.Fla.1982).

■ Taking the last approach first, if this Court were to exercise its independent judgment, we would be confronted with two general principles. With respect to debt obligations, the place of payment is normally considered to be the place of performance for purposes of determining the applicable law. Preble and Herskowitz, *Recent Changes In California And Federal Usury Laws: New Opportunities for Real Estate And Commercial Loans,* 13 Loy.L.A. L.Rev. 1, 44 (1979) ("Usury Laws"). The validity of lending agreements has generally been held to be governed by the law of the place of performance. *Ury v. Jewelers Acceptance Corp.,* 227 Cal.App.2d 11, 16, 38 Cal.Rptr. 376 (1964). While the validity of conveyances of real property, and the nature of any security interest in such property, is generally determined by the law of the situs of the property. *In re Parkwood, Inc.,* 461 F.2d 158, 171 (D.C.Cir.1971). *See In re Gresham,* 311 F.Supp. 974, 976 (E.Va. 1970). In comparing these principles, this Court would look to the jurisdiction in which the property is located, as it should be accorded deference and its law should control. *See In re Rogal,* 112 F.Supp. 712, 718 (S.Cal.1953). *But see Whitman v. Green,* 289 F.2d 566, 567 (9th Cir.1961).

However, if we follow *Bagley* and look to the conflicts rules of California for guidance, we have further complications given that these rules have, in recent years, undergone revolutionary change. In 1964, in *Ury,* it was recognized that commercial loan transactions should be upheld if they would be valid in the state of the making and performance of the contract, even though the contract would be usurious under California law. *Ury v. Jewelers Acceptance Corp., supra,* 227 Cal.App.2d at 19, 38 Cal. Rptr. 376. This decision, of course, was based on that court's determination that California did not have a strong public policy against usury, at least when viewed in the choice of law context. 227 Cal.App.2d at 20, 38 Cal.Rptr. 376. *But see Gamer v. DuPont Glore Forgan, Inc.,* 65 Cal.App.3d 280, 287, 135 Cal.Rptr. 230 (1976).

Then in 1970, in a case involving a sale/leaseback situation, it appears that California law was applied based on the traditional "most significant relationship" to the transaction analysis. *Rochester Capital Leasing Corp. v. K & L Litho Corp.,* 13 Cal.App.3d 697, 91 Cal.Rptr. 827 (1970). *See Usury Laws, supra,* 13 Loy.L.A.L.Rev. at 51.

Each of these relatively recent decisions are now suspect, given the emergence of the "governmental interest" approach to resolving conflicts questions, which first found voice in 1967. *See Ashland Chemical Co. v. Provence,* 129 Cal.App.3d 790, 793, 181 Cal.Rptr. 340 (1982). Simply stated, this rule requires an analysis of the respective interests of the states involved, with the objective of determining the law that most appropriately applies to the issues involved. *Bernhard v. Harrah's Club,* 16 Cal.3d 313, 316, 128 Cal.Rptr. 215, 546 P.2d 719 (1976). In applying this rule we begin with the premise that the law of the forum will be displaced only if there is a compelling reason. *Usury Laws, supra,* 13 Loy.L. A.L.Rev. at 53. The mechanical application of this approach was summarized by the Ninth Circuit Court of Appeals, as follows:

> Before a California court makes a choice of law, it will first consider the actual stake that the potentially concerned states have in the litigation. [Citations]. The court will examine the decisional rule of a sister state and will determine whether the state interests the rule is designed to protect will be significantly furthered by its application to the case at hand. Generally, the preference is to apply California law, rather than choose the foreign law as a rule of decision. [Citation]. Therefore, if application of a foreign decisional rule will not significantly advance the interests of the foreign state, a California court will conclude that the conflict is "false" and apply its own law. [Citations]. Only if both California and the foreign state have a strong interest in the application of their own law to the controversy will a true conflict be said to exist, requiring an examination of the "comparative impairment" to each states' interest of the choice of one rule over the other. [Citations]. This approach is applied to contracts cases as well as in the more familiar tort context [Citations].

*Strassberg v. New England Mut. Life Ins. Co.,* 575 F.2d 1262, 1264 (9th Cir.1978). *See also In re Air Crash Disaster Near Chicago, Ill., Etc.,* 644 F.2d 594, 621–22 (7th Cir. 1981).

In applying this standard, the first concern is to determine whether there are sufficient contacts with California, the forum state, to give it an interest in applying its own law to the transaction. There must be some minimal contact with California. Here, there are several significant contacts which satisfy this requirement—the subject property is located in California and Scrap does business here. *See Usury Laws, supra,* 13 Loy.L.A.L.Rev. at 57. Naturally, given that Peck is located in Virginia, which is also the place for payment and where the lion's share of the negotiations took place, then that state certainly has sufficient contacts to give it the necessary interest to present a choice of law question.

Now, we must examine the decisional law of both concerned states to see if we have a "true conflict." This Court must observe, at the start, that the laws of the two states—California and Virginia—applicable to the issues involved, are not identical. On judging the question of the true nature of the transaction itself, the two states appear to follow similar principles. Each treats transfers of property made only as security for the performance of another act, as a mortgage. *Compare* Cal.Civ.Code § 2924 *with Pretlow v. Hopkins,* 182 Va. 826, 30 S.E.2d 557, 558 (1944).[10] Such determinations are made upon evidence of the actual intention of the parties, rather than relying simply on the form chosen to memorialize the transaction. *Compare In re Berez,* 646 F.2d 420, 421 (9th Cir.1981); *Rochester Capital Leasing Corp. v. K & L Litho Corp., supra,* 13 Cal.App.3d at 701, 91 Cal.Rptr. 827; *with Holladay v. Willis,* 101 Va. 274, 43 S.E. 616, 618 (1903); *Johnson v. Johnson,*

---

**10.** In determining what property constitutes the realty securing a mortgage, both states appear to follow similar rules defining what property are fixtures. *Compare Specialty Restaurants Corp. v. County of Los Angeles,* 67 Cal. App.3d 924, 933, 36 Cal.Rptr. 904 (1977); *Sea-* *train Terminals of California, Inc. v. County of Alameda,* 83 Cal.App.3d 69, 74, 147 Cal.Rptr. 578 (1978); *with Bolling v. Hawthorne Coal Co.,* 197 Va. 554, 90 S.E.2d 159 (1955); *State Highway & Transp. Comm'r v. Edwards Co.,* 220 Va. 90, 255 S.E.2d 500, 503 (1979).

183 Va. 892, 33 S.E.2d 784, 789 (1945). And, in each state the party attacking the form of the transaction must satisfy the burden of showing the contrary by clear and convincing evidence. *Compare In re San Francisco Industrial Park, Inc.,* 307 F.Supp. 271, 276 (N.Cal.1969); *Beeler v. American Trust Co.,* 24 Cal.2d 1, 7, 147 P.2d 583 (1944); *Develop-Amatic Engineering v. Republic Mortgage Co.,* 12 Cal.App.3d 143, 148, 91 Cal.Rptr. 193 (1970); *with Hunter v. Bane,* 153 Va. 165, 149 S.E. 467, 468 (1929); *Pretlow v. Hopkins, supra,* 30 S.E.2d at 558.

However, when dealing with the question of usury, we have a significant divergence in the legal policies followed by these two jurisdictions. Both states purport to have a strong public policy against usury. *Compare Boerner v. Colwell Co.,* 21 Cal.3d 37, 54, 145 Cal.Rptr. 380, 577 P.2d 200 (1978) (Mosk, J., dissenting); *Gamer v. DuPont Glore Forgan, Inc., supra,* 65 Cal.App.3d at 287, 135 Cal.Rptr. 230; *with* Va.Code Ann., § 6.1–330.11 (Repl.Vol.1979); *Heubusch v. Boone,* 213 Va. 414, 192 S.E.2d 783, 789 (1972). But, neither state applies usury to *bona fide* sales transactions. *Compare Matter of T.R. Axton Sr. Corp.,* 533 F.2d 503, 504 (9th Cir.1976); *Fox v. Federated Department Stores, Inc.,* 94 Cal.App.3d 867, 877, 156 Cal.Rptr. 893 (1979); *with General Electric Credit Corporation v. Lunsford,* 209 Va. 743, 167 S.E.2d 414, 418 (1969); *Kidd v. Brothers,* 212 Va. 197, 183 S.E.2d 140, 141 (1971). And, Virginia has passed specific legislation which bars corporations from pleading usury. Va.Code Ann., § 6.1–330.-43 (Repl.Vol.1979). *See Tuttle v. Haddock,* 213 Va. 63, 189 S.E.2d 363, 365 (Va.1972). While California continues to be ambivalent in its usury policies, with major liberalization being enacted as recently as November 6, 1979, via Proposition 2, it still allows corporations to plead usury. Thus, we find a significant deviation in the usury laws of the two states.

In weighing Virginia's interest in the dispute, it must be recognized that some of the traditional factors denominated as "con-

tacts" are associated with Peck's home state. Most of the negotiations and payments occurred there. Further, by specifically excluding corporations from the protection of its usury laws, Virginia has indicated a desire to restrict these interest limitations to loans to individuals, presumably while acting as consumers. However, while Virginia has a great interest in seeing that its local contracts are respected, it would have little interest in a dispute over property located on the Pacific Coast.

California, on the other hand, has a great interest in litigation over property, especially realty, located within its borders. While California has recently had to recognize the reality of the market place by loosening the limits established by the usury laws, it still has a strong policy of protection, even of commercial or corporate borrowers, albeit not as strong as for individuals borrowing primarily for personal, family or household purposes. *See* Cal. Const. art. XV, § 1(1) (as amended Nov. 6, 1979). The fact that the people of California have now pegged, at least in part, the maximum allowable interest rates on commercial loans to the "discount rate" established by the Federal Reserve Bank, located in San Francisco, should not overshadow the longstanding general state policy of restricting rates to be charged for most loans.

█ Then, in comparing the various interests of both states, it becomes quite clear that California has the most at stake here, for the parties are contesting rights to local property. The concern for consistent and proper determinations as to entitlement to local real property, and the lesser interest that Virginia has at stake, require a California state court to choose its own law.

Therefore, just as in *Woods-Tucker,* the application of an independent federal choice of law rule and the forum state's choice of law rule would lead to the same result. 642 F.2d at 749. Here, that result calls for the application of California law to determine the legal issues presented.[11]

11. One bonus accorded by this result is that California has a more exhaustive inventory of recent decisional law on the other questions presented than has Virginia.

B. *True Nature of the Transactions*

Simply stated, it is the trustee's theory of the case that while the documents evidencing these transactions were cast in the form of a sale/leaseback, with a repurchase option, they were in fact loans from Peck to Scrap and that casting the transactions in another form does not insulate them from the usury laws.

In determining the validity of the trustee's position, we are guided by several general principles. As stated earlier, under Section 2924 of the California Civil Code, every transfer of an interest in property, made only as a security for the performance of another act, is to be deemed a mortgage. Thus, conveyances absolute on their face may be shown to be in fact loans or security transactions. *Cowles v. Zlaket,* 167 Cal. App.2d 20, 28, 334 P.2d 55 (1959).[12]

 However, there is a strong presumption that a deed and lease, with an option to repurchase, are what they purport to be. *In re San Francisco Industrial Park, Inc., supra,* 307 F.Supp. at 271. *See also Munger v. Moore,* 11 Cal.App.3d 1, 9, 89 Cal.Rptr. 323 (1970). Whether a lease agreement is a true lease or one intended for security is determined solely by reference to the intent of the parties at the time of execution of the agreement.[13] *See In re J.A. Thompson & Son, Inc.,* 665 F.2d 941, 947 (9th Cir.1982); *In re San Francisco Industrial Park, Inc., supra,* 307 F.Supp. at 274. In deciding just what the true intent of the parties was when the deal was arranged, all facts and circumstances must be weighed, reviewed and considered by the Court. *Workmon Constr. Co. v. Weirick, supra,* 223 Cal.App.2d at 491, 36 Cal.Rptr. 17; *Develop-Amatic Engineering v. Republic Mortgage Co., supra,* 12 Cal.App.3d at

149, 91 Cal.Rptr. 193. The significant consideration is the substance of the transaction, rather than its form or the terminology used by the parties. *Burr v. Capital Reserve Corp.,* 71 Cal.2d 983, 989, 458 P.2d 185 (1969). *See also Matter of Ellis,* 674 F.2d 1238, 1247 (9th Cir.1982). In this, the Court must consider whether the arrangement actually transfers the normal risks and responsibilities of a landlord to the purchaser-lessor, and whether the payments under the lease are reasonably designed to compensate the lessor for the use of the property; or simply reflect a repayment of the lessor's acquisition cost plus interest. *See In re Nite Lite Inns,* 13 B.R. 900, 908, 7 B.C.D. 1388, 1392 (S.Cal.1981). In any event, in dealing with a conveyance absolute in form with an option to repurchase, the one asserting that it is a loan must establish that fact by evidence which is clear and convincing. *Cowles v. Zlaket, supra,* 167 Cal.App.2d at 27, 334 P.2d 55. *See also Wineberg v. Moore,* 194 F.Supp. 12, 14 (N.Cal.1961); *Beeler v. American Trust Co., supra,* 24 Cal.2d at 7, 147 P.2d 583.

Here, we are dealing with a deal cast as a sale/leaseback arrangement. The sale/leaseback form is a relatively modern, and clever, structure of financing which affords significant advantages to both purchaser-lessor and seller-lessee. *See In re San Francisco Industrial Park, Inc., supra,* 307 F.Supp. at 276; *In re Velasco,* 13 B.R. 872, 874 (W.Ky.1981). The evidence shows that Peck insisted that the transaction be structured as an outright sale of the real property and equipment from Scrap to Peck, in order for the latter to avoid income tax liabilities from the Phillip Morris sale, by setting up the transaction to appear as a "like for like" trade within the permissive provisions of 26 U.S.C. § 1031.[14] *See Natu-*

---

12. In California, a loan has been defined as "the delivery of a sum of money to another under a contract to return at some future time an equivalent amount with or without an additional sum agreed upon for its use." *Rochester Capital Leasing Corp. v. K & L Litho Corp., supra,* 13 Cal.App.3d at 702, 91 Cal.Rptr. 827.

13. Of course, the secret intention of one of the parties is insufficient to change the character

of a transaction. *Glasgow v. Andrews,* 129 Cal.App.2d 660, 665, 277 P.2d 400 (1954); *Workmon Constr. Co. v. Weirick,* 223 Cal. App.2d 487, 492, 36 Cal.Rptr. 17 (1963).

14. Naturally, the significant tax savings of a "1031 Exchange" can be a strong motivation which can induce parties to resort to the subterfuge of clothing a mortgage in the guise of an outright conveyance.

ral Resources, Inc. v. Wineberg, 349 F.2d 685, 688 (9th Cir.1965). The arrangement was a "triple net" lease which has become a standard for commercial leases, especially those of long duration. See e.g., In re Nite Lite Inns, supra, 13 B.R. at 905, 7 B.C.D. at 1390. Mr. Williams saw the transaction as simply a loan and relied on Peck's assurances that Scrap would get to use the funds borrowed for at least two years.

Mr. Gottlieb indicated that it was Peck's policy to limit its loans to 50% of the collateral. In this instance it was left to Scrap's comptroller, Mr. O'Brien, to select the assets to be included in the deal, based solely on their book values, in an effort to minimize any taxable gain to Scrap.

In actuality the assets transferred to Peck were worth at least twice as much as the funds paid over by it. Such a large inequality or discrepancy in values has been characterized as a "strong circumstance" tending to show that the transaction was a disguised financing scheme. Beeler v. American Trust Co., supra, 24 Cal.2d at 17, 147 P.2d 583. See also In re 716 Third Avenue Holding Corp., 340 F.2d 42, 47 (2d Cir.1964); Kapelus v. A Joint Venture, 377 F.2d 815, 816 (9th Cir.1967); In re San Francisco Industrial Park, Inc., supra, 307 F.Supp. at 275.[15]

Another strong indicator is the option provisions contained in Section 30 and 51 of the lease. Section 30 gave Scrap the right to "repurchase" the assets it had transferred, along with the shear. The mechanics of this provision required Scrap to find other realty to allow Peck to continue its tax-free exchanges. But, the essence of the provision was that Scrap could regain its assets by reimbursing Peck for its $1.6 million investment by paying over that sum in

land or cash, plus $445,000 in land or cash for the shear. In Section 51, we find the parallel provision giving Peck the power to force Scrap to pay over $2,045,000 in land or cash in exchange for the return of the assets, which, of course, Scrap had in its possession as nominal lessee.[16] Now, it is well recognized that a sale subject to an option to repurchase can be, in some circumstances, a disguised loan. Swallow Ranches, Inc. v. Bidart, 525 F.2d 995, 997 (9th Cir.1975); Burr v. Capital Reserve Corp., supra, 71 Cal.2d at 990, 458 P.2d 185. The inclusion of an option to repurchase does not of itself make a lease one intended for security. Triple C. Leasing, Inc. v. All-American Mobile Wash, 64 Cal.App.3d 244, 248, 134 Cal.Rptr. 328 (1976). Instead, we must be aware of the economic realities of the case and, where, at the end of the lease term, if the only sensible business decision for the lessee would be to repurchase the assets, then it must be considered another strong circumstance suggesting that the transaction is in fact a financing scheme. See In re Pacific Sunwest Printing, 6 B.R. 408, 412 (S.Cal.1980).[17] Here, the assets included had a fair market value far in excess of the option price, while the term of the lease was of a relatively short duration. This great disparity suggests that Scrap would have been under an economic compulsion to exercise the option to repurchase. See Swallow Ranches, Inc. v. Bidart, supra, 525 F.2d at 998; Orlando v. Berns, 154 Cal.App.2d 753, 756–57, 316 P.2d 705 (1957).

In reaching a conclusion as to the true nature of the transactions we must consider the November 1977 release of the Compton property to Scrap, in return for the one dollar payment to Peck. Obviously, the intent of the parties can be shown by their

---

**15.** The disparity between the lease payments during the initial term of the lease, and the then prevailing market rates does not appear to be of any significance. The parties obviously had an arrangement for cash payments to bring the contract payments more in line with the market. In any event, such a difference would be a neutral factor in determining whether this was a sale/leaseback as opposed to a financing arrangement, for both landlords and lenders expect to make a profit.

**16.** This is in accord with Peck's general desire, as expressed through Mr. Gottlieb, that it did not want to fix itself into a "unique piece of property."

**17.** Of course, the absence of a purchase option in a lease does not preclude a finding that the lease was actually a disguised secured loan. In re Berez, supra, 646 F.2d at 421.

conduct subsequent to the execution of the transaction. *Jensen v. Friedman,* 79 Cal. App.2d 494, 498, 179 P.2d 855 (1947); *Greene v. Colburn,* 160 Cal.App.2d 355, 358, 325 P.2d 148 (1958). The release of the property worth $79,000, without compensation, is not the act of the true owner, but instead, is conduct consistent with that expected from an oversecured creditor which believes its interest is fully protected and is agreeable to actions which would improve the debtor's liquidity. It again confirms that Peck always intended to exercise the option contained in Section 51 of the lease. This would result in Peck regaining its investment after receiving compensation for use of its money over the term of the lease.

■ In the final analysis, based on all of the circumstances, the trustee has satisfied his burden by showing, by clear and convincing evidence, that the deal involving these parties was intended to be a loan to Scrap. Peck never assumed the normal risks of ownership, such as the risk that the value of the property might decline and, of course, Scrap had the instrument, by way of an option, to deprive Peck of any increase in value. Peck was not concerned with which assets were included with the National City real estate, given that this property and the shear gave full protection for the loan involved.[18] The options show that the parties anticipated that the assets would be returned to Scrap at the conclusion of the lease term. The release of the Compton property to Scrap shows that Peck had every intention of forcing Scrap to redeem its property under Section 51 of the lease. Both parties intended to create a debtor-creditor relationship, but the deal had to be cast as a sale/leaseback in order to provide a tax shelter to Peck. This is understandable, for individuals bent on disguising the true nature of their business dealings can hardly be expected to reveal their unstated intentions, especially in the writings they create. *See In re Nite Lite Inns, supra,* 13 B.R. at 908, 7 B.C.D. at 1392. After reviewing all the evidence, this Court must conclude that the heart of this transaction was a transfer of money with Peck holding the power to create an absolute obligation to repay. *See Golden State Lanes v. Fox,* 232 Cal.App.2d 135, 141, 42 Cal.Rptr. 568 (1965).

### C. Propriety of Interest Charges

Since August 6, 1976, when the initial lease was executed, Peck has been paid $3,158,161.58, consisting of $701,761.59 in lease payments made prior to Scrap filing its bankruptcy petition, and $2,456,399.99 in post-petition payments. The trustee claims that the amount received is in violation of California law, outlawing usurious interest charges.

California's law of usury is based upon the provisions of article XV (formerly art. XX) of the state constitution. *Boerner v. Colwell Co., supra,* 21 Cal.3d at 43, 145 Cal.Rptr. 380, 577 P.2d 200. *See also* Cal. Civ.Code § 1916, *et seq.* ("Usury Law"). The people of California have made it clear that they reject the charging of usurious interest as an acceptable commercial practice when they first adopted an initiative measure by popular vote in 1918, and in 1934 when they caused the prohibition against usury to be placed in the California Constitution. *Fox v. Federated Department Stores, Inc., supra,* 94 Cal.App.3d at 876, 156 Cal.Rptr. 893. *But see Ury v. Jewelers Acceptance Corp., supra,* 227 Cal. App.2d at 20, 38 Cal.Rptr. 376.

■ Although intent is an element of usury, a conscious attempt to evade the usury laws need not be proved. Usury may be found where there has been nothing more than knowing receipt of sums above the legal rate of interest. *See Boerner v. Colwell Co., supra,* 21 Cal.3d at 54, 145 Cal.Rptr. 380 (Mosk, J., dissenting); *Burr v. Capital Reserve Corp., supra,* 71 Cal.2d at 989, 458 P.2d 185. In reviewing any challenged transaction, it should be noted that whether a business transaction is usurious depends on its own facts, with the presumption against the existence of usury. *Stafford-Lewis v. Wain,* 128 Cal.App.2d 614, 621, 276 P.2d 157 (1954); *Arneill Ranch v.*

---

18. Mr. Peck considered this property as "security" for Peck's investment.

*Petit,* 64 Cal.App.3d 277, 289, 134 Cal.Rptr. 456 (1976). It makes no difference whether the borrower or the lender takes the initiative in the transaction, or prepares the documents involved. *Golden State Lanes v. Fox, supra,* 232 Cal.App.2d at 140, 42 Cal. Rptr. 568. And, a contract, not usurious in its inception, does not become usurious by subsequent events. *Strike v. Trans-West Discount Corp.,* 92 Cal.App.3d 735, 745, 155 Cal.Rptr. 132 (1979).

With these general principles in mind, we can look to the instant transactions. The initial "lease" commenced in early August 1976 and ran for three years. It called for payments of $276,075, which were supplemented by cash payments during this period of $125,000, for a total of $401,075. This agreement was extended for one year, with that additional term being further extended to July 31, 1981, by operation of the Chapter 11 proceedings. During this second phase of the loan, commencing in August 1979, Peck received $298,686.59 in nine monthly payments under the lease, and the $2,000 cash payment forwarded via Federal Express. Peck also received $2,456,-399.99 in post-petition payments on its secured claim. The pre-petition monthly interest payments were based on a rate tied to the prime rate charged by a New York money center bank, with a minimum of $20,532.50 per month. Now, in calculating whether the usury laws have been violated, the general rule is that the Court must consider the entire amount of money available to the debtor and the entire length of time during which the debtor has the money available to it. *French v. Mortgage Guarantee Co.,* 16 Cal.2d 26, 29–30, 104 P.2d 655 (1940); *Lakeview Meadows Ranch v.*

*Bintliff,* 36 Cal.App.3d 418, 423, 111 Cal. Rptr. 414 (1973). However, where as here, the parties agree to different rates for different periods of the loan, the interest payable for each portion of the loan period must itself come within the maximum legal rate. *Arneill Ranch v. Petit, supra,* 64 Cal. App.3d at 293, 134 Cal.Rptr. 456.[19]

Now, in attempting to determine the maximum legal rate, we must be mindful of the changes made in 1979 with the enactment of Proposition 2. That enactment amended the state constitution to allow interest, on nonpersonal loans, as the greater of 10% per annum, or 5% per annum over the discount rate of the Federal Reserve Bank of San Francisco as of the 25th day of the month preceding the earlier of: (1) the date of execution of the contract to make the loan, or (2) the date of making the loan. *Usury Laws, supra,* 13 Loy.L.A.L.Rev. at 9, 12. While Proposition 2 was not approved by the voters until November 6, 1979, it is of no moment, for the California courts have declared it applicable retroactively to all causes of action not then reduced to judgment. *Orden v. Crawshaw Mortgage & Investment Co.,* 109 Cal.App.3d 141, 144, 146, 167 Cal.Rptr. 62 (1980); *Chapman v. Farr,* 132 Cal.App.3d 1021, 1023–24, 183 Cal. Rptr. 606 (1982).[20] Now, on the key dates of August 6, 1976 and December 1978, the dates of the agreement and the extension, the discount rates were 5½% and 9½% respectively. Then, as of the execution of the initial three year agreement, the maximum interest that was allowable under California law was 10½% per annum. As applied to the principal balance of $2,045,000, over the first three years the maximum allowable interest would have been $644,175. In fact,

---

**19.** Further, interest rate limitations do not apply to credit sales of property, which may be made at any price agreed upon by the parties. *Boerner v. Colwell Co., supra,* 21 Cal.3d at 45, 577 P.2d 200; *In re Giantvalley,* 14 B.R. 457, 458–59 (Nev.1981) (California usury law construed). *See also Hogg v. Ruffner,* 1 Black 115, 119, 66 U.S. 115, 119, 17 L.Ed. 38 (1861); *Blackmore Inv. Co. v. Johnson,* 32 F.2d 433, 435 (9th Cir.1929). But, this rule only applies when the loan or forbearance is merely incidental to the sales agreement. *Calimpco, Inc. v.*

*Warden,* 100 Cal.App.2d 429, 442, 224 P.2d 421 (1950), overruled, in part, on other grounds, *Fazzi v. Peters,* 68 Cal.2d 590, 591, 440 P.2d 242 (1968).

**20.** Given that Proposition 2 is retroactive, then we do not have to determine the applicability of the Depository Institutions Deregulation and Monetary Control Act of 1980, Pub.L. 96–221, which would apparently allow the same interest rates authorized by Proposition 2. 12 U.S.C. § 86a.

Peck only received $401,075. Thus, the payments made pursuant to the initial "lease" agreement were well within California's usury laws. Difficulty, however, is presented under the terms of the second loan period as shown by the agreement signed in December 1978. The parties agreed to an extension of the loan for another year in return for a significant increase in the interest charged. Under this arrangement Scrap was required to make variable interest payments based on the prime rate charged by the First National Bank of New York, with a minimum of $20,532.50 each month, but with no stated maximum.[21]

For the extended loan period commencing on August 9, 1980, the maximum allowable interest rate would have been 14½% per annum. The actual payments made, including the $2,000 cash payment, totaled $300,686.59. This means that for the ten months just prior to the petition being filed, Scrap was paying interest at an annual rate of 17.64%.[22] On its face, it would appear that the interest paid was in excess of permissible limits.

But, when dealing with a variable rate contract, recent decisions have noted that such agreements will be upheld if the transaction was consummated in good faith without any intent to avoid the usury laws, even though the rate agreed to *may at times* exceed the constitutional maximum. *McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc., supra,* 21 Cal.3d at 369, 378, 146 Cal.Rptr. 371, 578 P.2d 1375; *Arneill Ranch v. Petit, supra,* 64 Cal.App.3d at 283, 134 Cal.Rptr. 456; *Usury Laws, supra,* 13 Loy.L.A.L.Rev. at 15, 17. In judging the good faith of the parties, we need go no further than the minimum required payments of $20,532.50 each month. The minimum interest rate calculates out at 12.05% per annum. Here, then, the parties exhibited their lack of good faith by contracting for a rate of interest in excess of the then permissible interest limit of 10% per annum. Given that these parties intended to charge interest at a rate in excess of that allowed by the usury laws, and that the actual interest payments during the extension period exceeded even the greatly liberalized limitation of 14½% established by Proposition 2, then we have a clear violation of California's usury laws.

The trustee urges this Court to award treble damages under Cal.Civ.Code § 1916–3(a). Now

[t]he recovery of treble interest is a cumulative remedy so that the borrower can recover treble the interest paid within one year of the commencement of the suit, plus actual interest paid prior to the year preceding the action and within two years of the suit.

*Usury Laws, supra,* 13 Loy.L.A.L.Rev. at 6. *See Handi Inv. Co. v. Mobil Oil Corp.,* 653 F.2d 391, 393 (9th Cir.1981). However, the award of treble damages depends on the relative guilt of the parties initiating the transaction, *Golden State Lines v. Fox, supra,* 232 Cal.App.2d at 142, 42 Cal.Rptr. 568; and is always within the trial court's wide discretion. *See Burr v. Capital Reserve Corp., supra,* 71 Cal.2d at 994, 458 P.2d 185; *Buck v. Dahlgren, supra,* 23 Cal.App.3d at 788, 100 Cal.Rptr. 462. In judging the relative guilt of these parties, we must note that the trustee stands in the shoes of Scrap, with no better right or title than the debtor. *See In the Matter of Forester,* 529 F.2d 310, 316 (9th Cir.1976); *Cross Elec. Co. Inc., v. United States,* 664 F.2d 1218, 1220 (4th Cir.1981). Both parties were represented by experienced and sophisticated

**21.** The failure to state a maximum interest rate does not render an otherwise valid contract usurious. *See McConnell v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 21 Cal.3d 365, 369, 146 Cal.Rptr. 371, 578 P.2d 1375 (1978).

**22.** The time price rule can have no effect on this period, for the agreement not to insist on payment at the original maturity date of August 8, 1979, constituted a "forebearance,"

which is likewise governed by article XV of the California Constitution. *See Buck v. Dahlgren,* 23 Cal.App.3d 779, 785, 100 Cal.Rptr. 462 (1972). This applies equally to the actual loan and the sale of the shear, for as of August 9, 1979 there was a condition of forbearance of payment as to each. *See Crestwood Lumber Co. v. Citizens Sav. & Loan Assn.,* 83 Cal. App.3d 819, 824–25, 148 Cal.Rptr. 129 (1978).

businessmen when the transaction for the loan extension was negotiated. It does not appear that this would be an appropriate case to impose the drastic sanction requested by the trustee, given that the usury laws are primarily designed to penalize sharp operators taking advantage of unwary and necessitous borrowers. *See White v. Seitzman,* 230 Cal.App.2d 756, 761, 41 Cal.Rptr. 359 (1964). While Scrap may have been a necessitous borrower, no one can truly claim that Mr. Williams could be classed with the unwary.

■ In determining the effect of the payment of illegal interest, it should be noted that if interest in excess of the legal limit is charged, it renders the interest provisions of the contract void. *Strike v. Trans-West Discount Corp., supra,* 92 Cal. App.3d at 744, 155 Cal.Rptr. 132 (1979); *Epstein v. Frank,* 125 Cal.App.3d 111, 122, 177 Cal.Rptr. 831 (1981). However, even where usury is found, the lender has a right to recover the principal amount of the note when due, and payments on the loan, even though called interest, will be deemed principal repayment until that total is paid in full. *See Matter of Vehm Engineering Corporation,* 521 F.2d 186, 189–90 (9th Cir. 1975); *Teichner v. Klassman,* 240 Cal. App.2d 514, 524, 49 Cal.Rptr. 742 (1966); Cal.Civ.Code § 1916–2. Here, as of August 9, 1979, Peck had loaned Scrap a total of $2,045,000. This principal amount should be reduced by the $300,686.59 in actual usurious interest payments, resulting in a total outstanding principal balance of $1,744,-313.41 as of May 16, 1980, the date the Chapter 11 petition was filed.

**D. *Amount and Status of Peck's Claim***

In determining the amount and status of the claim that Peck has against Scrap, we must note that where a deed, absolute on its face, is given to secure a debt, it will be held to be a mortgage. *Greene v. Colburn,* 160 Cal.App.2d 355, 358, 325 P.2d 148 (1958). *See also* Cal.Civ.Code § 2924; *Kaiser Indus-*

*tries Corp. v. Taylor,* 17 Cal.App.3d 346, 350–51, 94 Cal.Rptr. 773 (1971). Here, Peck received such a deed which must be treated as a mortgage.[23] Being a mortgagee, under Section 506(a) of the Code, Peck is entitled to a secured claim to the extent of the value of the estate's interest in the property constituting the collateral. *See In re Walker,* 11 B.R. 43 (N.Ill.1981); *In re Frost,* 19 B.R. 804, 809, 8 B.C.D. 1377, 1378 (Kan.1982). The valuation of the property is made as of the date of the filing of the Chapter 11 petition. *See La Jolla Mortg. Fund v. Rancho El Cajon Associates,* 18 B.R. 283, 287, 8 B.C.D. 1035, 1036–7 (S.Cal.1982). Here, the petition was filed on May 16, 1980.

In his third claim for relief, the trustee claims that Peck's secured claim should be limited in amount to the value of the land and buildings involved, with no recognition being given to any value of the equipment, such as the shear. He then argues that since the value of Peck's claim is less than the $2,456,399.99 in post-petition distributions, then the difference must be recovered as an unlawful preferential distribution.

In approaching this issue, we should first ascertain the total amount of Peck's claim and then determine if it is fully secured by the value of the subject property.

*1. Post-Petition Interest*

■ As stated in the previous section of this opinion, Peck's claim for the outstanding principal as of May 26, 1980, was $1,744,313.41. Now, any usurious contract is void with respect to the obligation to pay interest, and the principal is not due until the expiration of the loan and cannot be accelerated as a result of a default in the payment of interest. Cal.Civ.Code § 1916–2; *Usury Law, supra,* Loy.L.A.L.Rev. at 5. *But see Haines v. Commercial Mortgage Co.,* 200 Cal. 609, 621, 254 P. 956, 255 P. 805 (1927), overruled on other grounds, *Heald v. Friis-Hansen,* 52 Cal.2d 834, 835, 840, 345 P.2d 457 (1959). However, the payee of a note with a usurious interest provision may

---

**23.** Peck's status differs from that of the claimants in *In re Nite Lite Inns,* for in that case the claimants denied that they were secured credi-

tors under the sale/leaseback. 13 B.R. at 910, 7 B.C.D. at 1393.

be entitled to damages in the nature of interest at the *legal rate* for any time of nonpayment after the date of maturity. *Epstein v. Frank, supra,* 125 Cal.App.3d at 123, 177 Cal.Rptr. 831. Since seven per cent is the applicable legal rate of interest, then Peck would be entitled to that additional interest from August 8, 1980, the maturity date under the extension agreement, if prejudgment interest were allowed.[24] *See* Cal. Const. art. XV; Cal.Civ.Code § 1916–1.

Peck argues that the legal rate is inadequate as it is entitled to more under California law and the Code. In the first instance, Peck makes reference to Section 29 of the lease which assesses interest on any amounts due to Peck if they are not paid on time. The late charge is to be calculated on the basis of four per cent above the prime rate charged by the First National City Bank of New York, but not less than 15% per annum. In this Peck notes that usury will not be found if it is caused by the voluntary default of the debtor. *See Thompson v. Gorner,* 104 Cal. 168, 37 P. 900 (1894); *Sharp v. Mortgage Security Corp.,* 215 Cal. 287, 290–91, 9 P.2d 819 (1932). From this, Peck would argue that while the basic interest obligation is void, the interest payable under the default provision should nevertheless be honored.

■ The cases which Peck relies upon all involve situations where the initial terms of the loan are within the usury laws and the higher interest is only charged upon a default by the debtor. *See e.g., First American Title Ins. & Trust Co. v. Cook,* 12 Cal.App.3d 592, 596, 90 Cal.Rptr. 645 (1970); *Fox v. Federated Department Stores, Inc., supra,* 94 Cal.App.3d at 884, 156 Cal.Rptr. 893. Reference to these cases cannot help us here for in this case the basic interest obligation has been found to be in violation of California law. This results in the inter-

est provisions being read out of the contract. *See Douglas v. Klopper,* 107 Cal. App.Supp. 765, 776, 288 P. 36 (1930). There being no interest provisions, then the contract is treated as a noninterest-bearing note entitled to prejudgment interest at the legal rate from the date of maturity. *See Epstein v. Frank, supra,* 125 Cal.App.3d at 123, 177 Cal.Rptr. 831. This accords fair treatment to Peck since Scrap was in its Chapter 11 status as of August 8, 1980, and was not free to make payment on that date without court approval, even if the amount due Peck had been determined.[25] *See Vanston Committee v. Green,* 329 U.S. 156, 166–67, 67 S.Ct. 237, 241–42, 91 L.Ed. 162 (1946).

■ Peck also contends that it is entitled to a higher rate of interest, than the legal rate, under the provisions of the Code. Under the Bankruptcy Act ("Act"), the predecessor to the Code, interest was allowed on oversecured claims. *See Vanston Committee v. Green, supra,* 329 U.S. at 164, 67 S.Ct. at 240–41; *United States v. Bass,* 271 F.2d 129, 130 (9th Cir.1959). This concept has been continued in the Code in Section 506(b) which grants to secured creditors the right to recover reasonable interest from any surplus value of the collateral above the allowed secured claim. *See Matter of Smith,* 4 B.R. 12, 13, 6 B.C.D. 424, 426 (E.N.Y.1980). This section does not have the limiting phrase "at the legal rate" as is found in Section 726(a)(5) of the Code. *See Fortgang & King, The 1978 Bankruptcy Code: Some Wrong Policy Decisions,* 56 N.Y.U.L.Rev. 1148, 1163 n. 57 (1981). The allowance of post-petition interest on over secured claims is to protect the secured creditor from loss caused by being paid over a period of time. *See Matter of Cooper,* 7 B.R. 537, 542, 7 B.C.D. 24, 27 (N.Ga.1980). However, under the Act it was clear that such awards of post-petition interest were

**24.** Peck's argument that it is entitled to 10% interest under Cal.Civ.Proc. § 685.010 is misplaced for that higher interest rate provision does not take effect until January 1, 1983. *See* Cal. Const. art. IV, § 8(c) (1966, amended 1972).

**25.** Given this resolution, it is not necessary to determine if the Section 29 provision is an unlawful penalty. *See* Cal.Civ.Code §§ 1670 and 1671; *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.,* 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973); *Crestwood Lumber Co. v. Citizens Sav. & Loan Assn., supra,* 83 Cal.App.3d at 826–27, 148 Cal.Rptr. 129.

governed by equitable principles. *See Matter of Minguey,* 10 B.R. 806, 809, 7 B.C.D. 691, 693 (W.Wisc.1981). As the enactment of Section 506(b) was intended to be a codification and not a modification of the then existing state of the law, then equitable principles would still be paramount under the Code. *Id. See In re Marx,* 11 B.R. 819, 821, 7 B.C.D. 1066, 1067 (S. Ohio 1981). The equities in this case would indicate that Peck, having contracted for the receipt of unlawful interest payments, should not receive more than the legal rate once the loan was due. This is especially apropos here as Peck has not been forthright in admitting the true facts surrounding the transactions and has forced the trustee to go to law in order to protect the estate's rights by establishing the actual state of affairs. This has delayed the administration of this estate and the payment on Peck's allowed secured claim. It is only equitable that the resulting burden on the estate be limited to interest charges as established at the legal rate under California law.

■■■■ The trustee likewise prays for prejudgment interest to be awarded to him on any overpayments made on Peck's claim. Now under California law a litigant is entitled to prejudgment interest when his claim is certain or can be calculated. *In re Sonoma V,* 23 B.R. 789, 795 (9th Cir.B.A.P.1982). *See Parvin v. Davis Oil Co.,* 655 F.2d 901, 905 (9th Cir.1979); *In re Consol. Pretrial Proceedings In Air West,* 436 F.Supp. 1281, 1286 (N.Cal.1977). Where damages are susceptible of ascertainment only by judicial determination on conflicting evidence, then prejudgment interest will not be awarded. *See Lineman v. Schmid,* 32 Cal.2d 204, 209–10, 195 P.2d 408 (1948); *Block v. Laboratory Procedures, Inc.,* 8 Cal.App.3d 1042, 1046–47, 87 Cal.Rptr. 778 (1970). This is because if a party does not know what amount he owes, he cannot be in default for not paying it. *Iverson v. Spang Industries, Inc.,* 45 Cal.App.3d 303, 311, 119 Cal.Rptr. 399 (1975). *See Goodwin v. Alston,* 130 Cal. App.2d 664, 671, 280 P.2d 34 (1955). While in an appropriate case a debtor may receive prejudgment interest on his overpayments on a usurious obligation, *see Douglas v.*

*Klopper, supra,* 107 Cal.App.Supp. at 777, 288 P. 36; this is not such a case, for the issues presented required this Court to resolve them based on conflicting evidence. The trustee, therefore, will not receive any interest for the period prior to the judgment being entered.

Now, this may appear unfair to the trustee to allow prejudgment interest to Peck while denying it to him. Appearances to the contrary, the result is required because Peck has an independent basis under Section 506(b) as a secured creditor, while the trustee must look solely to state law to determine his entitlement to such interest. *See* 11 U.S.C. § 506(b); *Vanston Committee v. Green,* 329 U.S. 156, 171, 67 S.Ct. 237, 244, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring).

**2. Attorneys' Fees and Costs**

Both parties have indicated that they believe they are entitled to be awarded attorneys' fees and costs. The trustee has made formal demand for $192,894 in fees and $75,887.17 in litigation expenses and costs. Peck has indicated that it has incurred approximately $200,000 in legal fees in regard to the proceedings before this Court.

The general "American Rule" is that attorneys' fees are not ordinarily recoverable costs in the absence of a statute or enforceable contract providing for them. *Summit Valley Industries v. Local 112, Etc.,* —— U.S. ——, 102 S.Ct. 2112, 2114–15, 72 L.Ed.2d 511 (1982); *Matter of Kennedy Mortg. Co.,* 23 B.R. 466, 473–74, 9 B.C.D. 805, 809 (N.J.1982).

■■ Under Sections 19 and 20 of the lease, there are provisions granting to Peck reimbursement for any attorneys' fees or litigation expenses associated with litigation concerning the terms of the lease. Such reimbursement clauses are valid under California law. *See In re Sonoma V, supra,* 23 B.R. at 796; *Erich v. Granoff,* 109 Cal. App.3d 920, 931, 167 Cal.Rptr. 538 (1980). However, under the terms of Cal.Civ.Code § 1717, this unilateral contract right to attorneys' fees is transferred into reciprocal

provision giving the right to recover to either party. *International Industries, Inc. v. Olen,* 21 Cal.3d 218, 223, 145 Cal.Rptr. 691, 577 P.2d 1031 (1978); *Care Constr., Inc. v. Century Convalescent Centers, Inc.,* 54 Cal. App.3d 701, 705, 126 Cal.Rptr. 761 (1976). Section 1717 requires that where the contract has an attorneys' fees provision then the "prevailing party" shall be awarded attorneys' fees and costs. *See Strike v. Trans-West Discount Corp., supra,* 92 Cal. App.3d at 746, 155 Cal.Rptr. 132.

Now, the trustee claims that he was the prevailing party since the final judgment to be issued in this litigation will be in his favor for a substantial sum. This has some support for several courts have taken the approach of declaring the party who obtains the net judgment in its favor as the prevailing party. *See Teichner v. Klassman,* 240 Cal.App.2d 514, 524, 49 Cal.Rptr. 742 (1966); *Hughes Tool Co. v. Max Hinrichs Seed Co.,* 112 Cal.App.3d 194, 203, 169 Cal.Rptr. 160 (1980). Such a mechanical approach cannot have validity here where Peck would have had a net judgment on its claim if this Court had ruled prior to August 3, 1981. Further, other California cases have made it clear that its not always the case that the party in whose favor the judgment is entered will be deemed the prevailing party. *See International Industries v. Olen, supra,* 21 Cal.3d at 224, 145 Cal.Rptr. 691, 577 P.2d 1031 (equitable considerations); *Epstein v. Frank, supra,* 125 Cal.App.3d at 124, 177 Cal.Rptr. 831 (party who prevails on all issues actually litigated). This is even more so in a case, such as this, where the judgment, as well as this opinion, must be considered good news and bad news to each of the parties. *See Kytasty v. Godwin,* 102 Cal.App.3d 762, 774, 162 Cal.Rptr. 556 (1980); *Kropp v. Ziebarth,* 601 F.2d 1348, 1358 (8th Cir.1979) (similar Montana statute construed).[26]

If this Court were put to the test of making a determination under Section 1717,

it would declare the trustee as the prevailing party for he has been successful on all the major contested points. He has shown that the sale/leaseback was a disguised financing scheme, Peck was receiving undisclosed cash payments, Peck had contracted for usurious interest payments and Peck has been overpaid on its allowed secured claim. *See Care Constr., Inc. v. Century Convalescent Centers, Inc., supra,* 54 Cal. App.3d at 707, 126 Cal.Rptr. 761 (lessee proved no valid lease).

However, this Court will not undertake such an exercise as Peck would appear to have an equally valid claim for attorneys' fees and costs under Section 506(b) of the Code. *See In re Carey,* 8 B.R. 1000, 1004, 7 B.C.D. 310, 312 (S.Cal.1981); *In re Virginia Foundry Co., Inc., supra,* 9 B.R. at 497. *But see In re Sholos,* 11 B.R. 782, 784–86, 8 B.C.D. 109, 110–11 (W.Pa.1981). Since it appears that each side has incurred fees and costs of comparable amounts, it would not serve any useful purpose for this Court to devote its time to an extensive examination of the details of these fees and costs as it would not produce any significant effect on the final judgment. Thus, each party will bear its own fees and expenses.

### 3. *Amount of Peck's Allowed Secured Claim*

As of the date of the Chapter 11 being filed, Peck had a claim against the estate of $1,744,313.41. To this we can add the $34,927.50 paid by Peck during these proceedings for real estate taxes and deduct the two payments made by the estate to Peck on April 6, 1981 and July 30, 1981, totalling $156,399.99. This leaves a total claim of $1,622,840.92. Peck is also entitled to interest at seven per cent per annum from August 8, 1980 to the final payment on the claim on August 3, 1981. This increases the amount of Peck's claim by $112,042.71 ($1,622,840.92 × 7% per annum × 360 days),[27] for a total claim of $1,734,883.63.

---

26. Under Federal Rule of Civil Procedure 54(d), the usual practice is not to allow costs to either party where both have prevailed in part. *See*

*Kalkowski v. Ronco, Inc.,* 424 F.Supp. 343, 354 (N.Ill.1976).

27. For ease in calculation, it is assumed that all debits and credits for cash expenditures had

In determining the actual value of the claim, we refer to California law which defines real property, in part, as consisting of land and that which is affixed to the land. Cal.Civ.Code § 658. Further, fixtures are defined as:

A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods.

Cal.Civ.Code § 660. As to whether an article constitutes a fixture, there are three factors to be taken into consideration: (1) the manner of its annexation to the realty; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention with which the annexation is made. *Cornell v. Sennes,* 18 Cal.App.3d 126, 132, 95 Cal.Rptr. 728 (1971); *Seatrain Terminals of California, Inc. v. County of Alamenda, supra,* 83 Cal.App.3d at 74, 147 Cal.Rptr. 578. In addition, the rules in reference to the rights with respect to fixtures are construed most strongly in favor of the mortgagee. *Cornell v. Sennes, supra,* 18 Cal.App.3d at 133, 95 Cal.Rptr. 728.

Here, the evidence shows that the value of the National City land with improvements and the buildings, have a total fair market value of $1,695,000 as of August 1, 1980.[28] In addition, the Peck transaction included certain machinery and equipment. The largest piece of equipment was an auto body shredder which, with its 9,000 horsepower motor, occupied an area 200 feet by 200 feet, being 100 feet high. The shredder was firmly attached to the foundation of poured concrete, reinforced on pilings and anchored with bolts to prevent vibration.[29] It weighs between two and three million pounds. This equipment has an estimated value of between $280,000 and $1,200,000. Also, the shear itself was firmly attached to the foundation. It has a value of between $326,000 and $900,000. Each of these items could, with considerable difficulty, be moved from the premises. But, simply because equipment can be moved elsewhere, does not mean they cannot be constructively attached to the real estate. *See Matter of Mahon Indus. Corp.,* 20 B.R. 836, 839 (E.Mich.1982). Also, the modern trend underlines that fixtures include articles such as heavy machinery, which are not even attached as securely as the instant equipment, but which are of such weight that the mere retention in place by gravity is sufficient to give them the character of permanency and, therefore, affixation to the realty. *Seatrain Terminals of California, Inc. v. County of Alameda, supra,* 83 Cal.App.3d at 75–77, 147 Cal.Rptr. 578. Great weight alone is an indicator of intended permanence, given the considerable expense incident to moving such equipment. *See Southern Cal. Tel. Co. v. State Board,* 12 Cal.2d 127, 137–8, 82 P.2d 422 (1938) (each unit weighing approximately 24,000 pounds); *Bank of America v. County of Los Angeles,* 224 Cal.App.2d 108, 113, 36 Cal. Rptr. 413 (1964); *Specialty Restaurants Corp. v. County of Los Angeles, supra,* 67 Cal.App.3d at 934, 136 Cal.Rptr. 904. Then, given their great weight and permanent attachment to the land by bolts and otherwise, the shredder and the shear are fixtures and constitute further collateral for the Peck claim.

been incurred as of August 8, 1980, with the necessary adjustments being made on the base amount as of that date.

**28.** Absent any evidence to the contrary this Court has assumed no material change in the fair market values from the date the petition was filed, May 16, 1980, to the appraisal date.

**29.** Boilers set on a concrete foundation have been found to be fixtures under Cal.Civ.Code § 660. *See Oakland Bk. of Sav. v. California P.B. Co.,* 183 Cal. 295, 298, 191 P. 1 (1920).

■ The total value of the land, the land improvements, fixtures and buildings are greatly in excess of Peck's total claim and it should therefore be allowed under Section 506 of the Code in its full amount of $1,734,883.63.

However, the trustee is correct in his claim that Peck must reimburse this estate with the difference between Peck's net secured claim and the $2.3 million distributed to Peck on August 3, 1981. In effect Peck has been overpaid on its claim by $565,-116.37. *See* 11 U.S.C. § 502(j); Bankruptcy Rule 307; 3 Bkr.-L.Ed., *Code Commentary and Analysis*, § 21.28; *Boyum v. Johnson,* 127 F.2d 491, 497 (8th Cir.1942); *In re Madden,* 388 F.Supp. 47, 51–52 (Ida.1974).

### E. *Other Issues*

In his fourth claim for relief, the trustee argues, that even if the transaction between Peck and Scrap was a *bona fide* sale/leaseback, then it did not comply with the provisions of California's fraudulent conveyance law. Cal.Civ.Code § 3440. Since this Court has determined that this was not a valid sale, then, as the trustee readily admits, Section 3440 has no applicability to the instant transactions under the teaching of *In re Berez, supra,* 646 F.2d 420.

Peck argues that this action for usury cannot be maintained relying on the well established principle that a cause of action under the Usury Law is not assignable. *See Esposti v. Rivers Brothers, Inc.,* 207 Cal. 570, 573, 279 P. 423 (1929); *Behymer v. G. Cavaglieri Mtg. Co.,* 5 Cal.App.2d 717, 720, 43 P.2d 330 (1935). This is because "the law of usury was never intended for the benefit of those who are not and cannot be injured by the usurious transaction." *Sosin v. Richardson,* 210 Cal.App.2d 258, 266, 26 Cal.Rptr. 610 (1962). The point has been raised several times in cases where the purchaser of real property questions the liens assumed. In those cases, the courts have rejected the claims on the grounds that the purchaser places himself in a position where he cannot allege usury without attempting to keep back part of the money which he agreed to pay for the mortgaged realty. *Ames v. Occidental Life Ins. Co.,* 210 Cal. 271, 273, 291 P. 182 (1930). *See Read v. Mortgage Guarantee Co.,* 11 Cal. App.2d 137, 142–43, 53 P.2d 377 (1936).

■ However, the power to pursue a usury action is vested in a trustee in bankruptcy. *See McCollum v. Hamilton Nat. Bank,* 303 U.S. 245, 247, 58 S.Ct. 568, 570, 82 L.Ed. 819 (1938) (case decided under Bankruptcy Act). California has ruled that federal receivers and trustees can maintain such actions on behalf of their estates. *See Scott v. Hollingsworth,* 215 Cal. 314, 9 P.2d 836 (1932); *North v. Cecil B. DeMille, Inc.,* 2 Cal.2d 55, 39 P.2d 199 (1934); *Nuckolls v. Bank of California,* 10 Cal.2d 266, 273, 74 P.2d 264 (1937).

■ While there has been some confusion in this case as to the totality of the assets sold to San Diego Steel, Inc., it is clear that the sale was free and clear of any interest held by Peck. The trustee has prosecuted this action in the name of the Scrap estate in an attempt to reduce Peck's lien. In this, the trustee's claims regarding violation of the usury laws are properly before this Court. *See Behymer v. G. Cavaglieri Mtg. Co., supra,* 5 Cal.App.2d at 721, 43 P.2d 330. Were it otherwise, a trustee would have to delay the proper disposal of estate property until the associated usury claims were finally determined. Such delay might cause great harm to an estate by increasing the expenses of administering the property, or by risking a decline in the value of the assets because of the trustee's inability to act in an expeditious manner.

## VI

### CONCLUSIONS

1. California law should be referred to in resolving those questions not governed by the Code.

2. The transaction was not a *bona fide* sale/leaseback and was merely a loan.

3. The interest charged by Peck during the extension period was in excess of that allowed under California law.

 

4. Peck's claim should be reduced by the $300,686.59 in usurious interest paid between August 9, 1979 and May 16, 1980.

5. Peck is entitled to a secured claim of $1,734,883.63, which includes the principal due as of the filing of the petition, the net of certain cash payments made by the parties during the Chapter 11 proceedings and seven per cent interest from August 8, 1980 to August 3, 1981, the date Peck was paid on its secured claim.

6. The trustee is entitled to recover $565,116.37, representing the difference between Peck's allowed secured claim and the $2.3 million paid to Peck on August 3, 1981.

This memorandum opinion shall constitute findings of fact and conclusions of law as required by Bankruptcy Rule 752.